Vivian M. RODE and Jay C. Hileman

v.

Nicholas G. DELLARCIPRETE, John Harhigh, Josephine Fure, Ruth Brown, and Robert Kinch, Pennsylvania State Police and Commonwealth of Pennsylvania, Richard Thornburgh, Leroy S. Zimmerman, and Jay Cochran, Jr.

Appeal of Vivian M. RODE.

No. 87–5368.

United States Court of Appeals, Third Circuit.

Argued Dec. 2, 1987.

Decided April 28, 1988.

Laurence W. Dague (argued), Harrisburg, Pa., Dianne E. Dusman, Harrisburg, Pa., for appellant.

Leroy S. Zimmerman, Atty. Gen., Andrew S. Gordon, Chief Deputy Atty. Gen., Calvin R. Koons, Deputy Atty. Gen. (argued), Harrisburg, Pa., for appellees.

Before WEIS, HIGGINBOTHAM and ROSENN, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

Vivian Rode, a civilian employee of the Pennsylvania State Police (PSP), filed a civil rights action against the defendants in the United States District Court for the Middle District of Pennsylvania under 42 U.S.C. §§ 1983 and 1985. She alleged that she had been unlawfully suspended from employment for several days and·that her duties and working conditions had been impermissibly altered. The district court granted motions to dismiss the action against the Governor and Attorney General of the Commonwealth of Pennsylvania and entered summary judgment for the remaining defendants. The plaintiff Rode appeals. We affirm the order of dismissal. We also affirm the summary judgment except insofar as it.rejects Rode's claim that she was improperly suspended from employment for exercising her right to free speech.

### I.

Rode and her co-plaintiff, Jay C. Hileman, had lengthy unblemished employment histories with the PSP before the defendants' challenged actions. Hileman, Rode's brother-in-law, had been employed by the PSP since 1946 and had attained the rank of major. Hileman, director of the Bureau of Personnel for a period of time in the 1970's, hired Rode as a clerk-typist in the bureau where she worked for eleven years without any negative evaluations or reprimands. She ultimately attained the position of Administrative Assistant I.

In 1980, Hileman became an area commander. The new director of personnel,

defendant John Harhigh, proceeded to reorganize the bureau. As part of this reorganization, he elevated the defendant Fure to supervisory status over Rode.

In June 1981, Rode received an overall excellent performance rating from her immediate supervisor, Lt. Ronald Rostalski, and from the new director of personnel, Harhigh. In April 1982, the bureau again rated Rode "excellent," this time by the defendant Josephine Fure and Lt. Rostalski. The defendants claim that this rating was not an accurate reflection of Rode's performance; they contend that Rode was already experiencing a personality conflict with Fure, her new supervisor.

In August 1982, Hileman, in response to a subpoena, testified in a civil rights lawsuit by Lieutenant Russell Clanagan against the PSP (the *Clanagan* case). Hileman's testimony supported Clanagan and contradicted testimony given by previous PSP employees. Following Hileman's testimony, Rode's objective employment record took a downward turn. She also asserts that she became the butt of derogatory statements made to her fellow employees after Hileman's testimony. She complains that she began to experience problems in her relationships with Fure and Harhigh. She received a written reprimand in October 1982 and a negative performance evaluation.

As Fure's subordinate, Rode was the bureau's authority on employee benefits. She had a private office and a fair degree of responsibility. She was transferred in May 1983 to another position at the same salary and benefit level. In her new job she had no private office and performed menial photocopying tasks or had no work assignments. She received a more favorable, but still negative, evaluation in her new position under defendant Ruth Brown.

In June 1983, a local reporter of the *Paxton Herald,* telephoned and questioned Rode about her personal difficulties within the PSP. A published article based in part on this interview suggested that the PSP was engaged in retaliatory harassment against Hileman and Rode. Rode received a two-day work suspension because of her participation in the interview.

In June 1986, Rode and Hileman filed the complaint forming the basis for this appeal.[1] This complaint named as defendants the PSP, the Commonwealth, and certain individuals who the plaintiffs claimed either participated in the course of retaliatory harassment or who knowingly acquiesced in its continuance.[2] In count I of her complaint, Rode alleged that the defendants violated her rights to freedom of speech and association, deprived her of property and discriminated against her based on racial animus. Rode sought relief from these actions under 42 U.S.C. § 1983. Relying on the same factual predicate, Rode asserted in count II that the defendants had engaged in a conspiracy in violation of section 1985 to deter Hileman from testifying in the *Clanagan* action. Finally, in count III, Rode challenged, on the basis of vagueness and overbreadth, the Administrative Regulations (AR's) under which she had been suspended after giving the interview to the news reporter.

The district court granted the defendants' motion to dismiss the action against Governor Thornburgh and Attorney General Zimmerman. The court then granted the remaining defendants' motion for summary judgment on the first two counts of the amended complaint. *Rode v. Dellarciprete,* 646 F.Supp. 876 (M.D.Pa.1986). After further briefing, the court enjoined the enforcement of certain PSP administrative regulations, but held that section 4–6.03A was not void for vagueness.

---

**1.** This was actually the third amended complaint in the action. Hileman challenged a pattern of retaliatory conduct following his testimony in the *Clanagan* action. Hileman settled his claims and is not a party-appellant.

**2.** Defendants Harhigh, Fure, Brown, and Kinch were supervisors of Rode. PSP Chief of Staff Dellarciprete and Governor Thornburgh alleg-

edly were aware of and acquiesced in the course of retaliation. Governor Thornburgh, Attorney General Zimmerman, Dellarciprete and PSP Commissioner Cochran were named as defendants on the theory that they were responsible for the enforcement of the allegedly unconstitutional PSP administrative regulations under which Rode was suspended.

## II.

The defendants are entitled to summary judgment so long as "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed.R.Civ. P. 56(c). Review of the district court's entry of summary judgment is plenary. *Gans v. Mundy*, 762 F.2d 338, 340 (3d Cir.), *cert. denied*, 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985). Factual inferences must be viewed in the light most favorable to the party opposing the entry of judgment and where the non-movant's allegations conflict with those of the movant, the former receive the benefit of the doubt. *Id.*

Rode's claims initially can be parsed along two different lines based upon the employment actions she challenges. First, Rode contends that the defendants violated her freedom of speech by imposing a two-day suspension because she submitted to a telephone interview with the *Paxton Herald* news reporter. Second, Rode asserts that the defendants harassed her by transferring her from the personnel bureau, giving her offensive or no assignments, and engaging in derogatory statements about her to fellow employees. Rode argues that these employment decisions are actionable under either 42 U.S.C. § 1983 or § 1985 because they were made (1) with racially discriminatory intent in violation of the equal protection clause of the fourteenth amendment; (2) to retaliate against Hileman through her in violation of 42 U.S.C. § 1985(2); or (3) to discourage her association with her brother-in-law Hileman.

Finally, Rode contends that the district court erred in dismissing defendants Thornburgh and Zimmerman from the suit. We first turn to Rode's challenge to her two-day suspension.

### A. *The Facial Validity of PSP Administrative Regulation 4–6.03A*

A news reporter interviewed Rode during non-work hours and questioned her concerning her employment problems at the PSP. The resulting news article criticized the PSP and stirred controversy allegedly leading to staff demoralization in the bureau. After a departmental hearing, Rode was suspended under the AR's which, in part, prohibited conduct bringing discredit upon the PSP. AR 4–6.0.

In count III of her complaint, Rode challenged the validity of the administrative regulations under which she had received her suspension. The district court found that several of the regulations were unconstitutional and this determination has not been appealed. The court nonetheless sustained Rode's suspension, holding AR 4–6.03A to be constitutional.

Section 4–6.03A provides:

Employees of the Pennsylvania State Police shall conduct themselves at all times in such a manner as to reflect most favorably on the Department and the Commonwealth thereby promoting good public relations. Undesirable conduct shall include immorality or any conduct not specifically mentioned in these rules which tends to bring the Department and/or Commonwealth into disrepute or reflects discredit upon the individual employee.

Rode challenged this provision on grounds of vagueness and overbreadth.

A statute or regulation governing conduct is unconstitutionally vague when it " 'either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess as to its meaning and differ as to its application.' " *Aiello v. City of Wilmington, Delaware*, 623 F.2d 845, 850 (3d Cir.1980) (quoting *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926)). Such a regulation violates the first essential of due process of law because it neither affords fair notice to potential violators nor provides standards for enforcement. *Id.* Statutory vagueness is especially problematic when it may "chill" the exercise of protected first amendment rights. *Id.; Baggett v. Bullitt*, 377 U.S. 360, 372–73, 84 S.Ct. 1316, 1322–23, 12 L.Ed.2d 377 (1964).

An individual has standing to challenge a provision on vagueness grounds only if it is vague as applied to that person. "Thus, when a litigant's conduct clearly falls within the permissible purview of a statute, such an individual lacks standing to challenge the statute for vagueness, even though the statute may well be vague as applied to others." *Aiello*, 623 F.2d at 850; *see also Parker v. Levy*, 417 U.S. 733, 755–56, 94 S.Ct. 2547, 2561, 41 L.Ed.2d 439 (1974) (one to whose conduct a statute clearly applies may not successfully challenge it for vagueness). The district court did not address Rode's standing to assert a vagueness challenge as the issue had not been addressed by the defendants. This court may raise issues of standing *sua sponte.*

■ Rode does not have standing to challenge the vagueness of AR 4–6.03A because the provision clearly applies to her conduct. The regulation prohibits acts bringing discredit upon the PSP or the Commonwealth. Rode's suggestion to the news reporter that she was being harassed because of racial animus in the PSP is conduct likely to bring the PSP into disrepute. *See Meehan v. Macy*, 392 F.2d 822, 835 (D.C.Cir.1968), *mod'd on diff grds*, 425 F.2d 469 (D.C.Cir.1968), *aff'd en banc*, 425 F.2d 472 (D.C.Cir.1969). Rode therefore did not have standing to challenge the vagueness of the statute and the court should not have addressed the question.

Rode· also challenged the regulation on overbreadth grounds. The district court, however, did not consider this issue. A statute or, in this instance, a regulation, is overbroad if it "does not aim specifically at evils within the allowable area of state control but, on the contrary, sweeps within its ambit other activities that in ordinary circumstances constitute an exercise of freedom of speech." *Thornhill v. Alabama*, 310 U.S. 88, 97, 60 S.Ct. 736, 742, 84 L.Ed. 1093 (1940). Such regulations which readily lend themselves "to harsh and discriminatory enforcement," *id.*, against an individual can deter the exercise of first amendment rights.

■ Overbreadth challenges may be brought even by claimants whose conduct was not constitutionally protected where hypothetical third parties might be chilled in the exercise of their first amendment rights by the statute. *Aiello*, 623 F.2d at 860. The Supreme Court, however, has narrowed the scope of such challenges where the statute or regulation applies to both conduct and speech, holding that "overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 U.S. 601, 615, 93 S.Ct. 2908, 2918, 37 L.Ed.2d 830 (1973). It would appear that AR 4–6.-03A legitimately prohibits a wide range of constitutionally unprotected conduct. In such circumstances it would be imprudent to invalidate the regulation on its face. Instead, any overbreadth "should be cured through a case-by-case analysis of the fact situations to which its sanctions, assertedly, may not be applied." *Id.* at 615–616, 93 S.Ct. at 2918.

### B. AR 4–6.03A As Applied

Turning to the application of the regulation, Rode asserts that it was improperly applied to punish her exercise of her first amendment rights. It is a well established principle that government employment does not require an employee to completely forego the exercise of the right to freedom of speech. *Wilson v. Taylor*, 733 F.2d 1539, 1542 (11th Cir.1984); *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Employees who claim that adverse employment action was taken against them based upon the exercise of this right bear a dual burden. They must show that they were engaged in constitutionally protected conduct and that the conduct was a "substantial" or "motivating factor" in the government employer's decision. *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977).

It is undisputed that Rode's telephone interview played a "substantial" or "motivating factor" in her suspension. The district court found, however, that Rode's

speech was unprotected because it "did not involve matters of public interest" but rather represented an unprotected "employee dispute over personnel policies." *Rode*, 646 F.Supp. at 881. The court relied in large part upon Rode's admission at her deposition that she had merely "agreed to speak to a reporter concerning [her] own personal problem with an employment situation." *Id.*

■ Public employees retain their first amendment right to comment on matters of public concern. *Pickering*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Thus, the protected or unprotected character of Rode's speech is a preliminary problem of importance. *See Connick v. Myers*, 461 U.S. 138, 143, 103 S.Ct. 1684, 1688, 75 L.Ed. 2d 708 (1983). Even if Rode's speech is found to be protected, however, her first amendment right must still be balanced against the State's right as an employer to promote the efficient delivery of its police services. *See Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734.

The Supreme Court has emphasized the importance of determining whether a public employee's speech touches on matters of public concern:

> [W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

*Connick*, 461 U.S. at 147, 103 S.Ct. at 1690. Otherwise, the Court noted, judicial oversight of federal or state employment would become intrusive and unmanageable. *Id.* at 146, 103 S.Ct. at 1689. The character of the employee's speech is a question of law to be determined by examining "the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147–48, 103 S.Ct. at 1690. (footnote omitted).

■ Complete reliance on Rode's motivation for speaking is inappropriate. In *Connick*, the employee was unhappy with her proposed transfer and it was this unhappiness which motivated her distribution of a questionnaire to fellow employees. However, this factor was not determinative in deciding whether the employee's speech concerned matters of public interest. The Court focused particularly upon the content of the employee's speech, finding that, for the most part, it concerned internal employment practices that had no public interest character. *Id.* at 148–49, 103 S.Ct. at 1690–91. Notwithstanding her motivation, the Court found that one question in the questionnaire, concerning pressure to participate in political campaigns, did touch upon a matter of public concern. *Id.* at 149, 103 S.Ct. at 1691.

Similarly, in *Czurlanis v. Albanese*, 721 F.2d 98, 104 (3d Cir.1983), this court determined that a public employee spoke on matters of public concern when he sought to bring to light actual or potential wrongdoing or breach of the public trust by certain public officials. We suggested that motivation was merely one factor to be considered, but not necessarily controlling, in assessing the character of the employee's speech. *Id.* *But see Callaway v. Hafeman, et al.*, 832 F.2d 414 (7th Cir. 1987), which we believe is distinguishable on its facts.

■ The content, form, and context of Rode's comments reveal that she was speaking on a matter of public concern. Rode's complaints, while expressed because of her personal employment problems with the PSP, were a matter of serious public import. Rode may have been the disgruntled employee so disfavored in *Connick*, 461 U.S. at 148, 103 S.Ct. at 1690, and *Czurlanis*, 721 F.2d at 104. But Rode did not merely claim that she was being mistreated—she claimed that she was a victim of retaliation arising out of racial animus within the PSP. This was a matter of grave public concern, especially in light of the prior protracted history of litigation against the PSP charging it with racial

animus in its employment practices,[3] and as evidenced by the news reporter's initiative in contacting Rode. Moreover, the hearings conducted by the state legislature to determine the extent of racial discrimination in the PSP attest to the public's concern.

Dismissing Rode's speech as unprotected merely because she had a personal stake in the controversy fetters public debate on an important issue because it muzzles an affected public employee from speaking out. Thus, we hold that when a public employee participates in an interview sought by a news reporter on a matter of public concern, the employee is engaged in the exercise of a first amendment right to freedom of speech, even though the employee may have a personal stake in the substance of the interview.

■ The determination that Rode's comments constituted protected speech does not end the inquiry. Her exercise of this right must be balanced against the right of her employer to promote the efficiency of the public services it renders through its employees. *Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734. Under *Connick,* the defendant may show that the PSP's legitimate interest in promoting efficiency, integrity, and discipline in public service outweighed Rode's interest in public discourse. 461 U.S. at 150–51, 103 S.Ct. at 1691–92. The district court did not reach this question of law. The relevant facts for the most part are undisputed. The parties have briefed the issue on appeal and, instead of remanding, we consider it in the interest of judicial economy. *See, e.g., Czurlanis,* 721 F.2d at 102, 105.

There is little evidence that Rode's speech reduced her ability to perform her duties, an important consideration in *Connick,* where the district attorney's office required close working relationships between the complaining assistant district attorney and her superiors. 461 U.S. at 151, 103 S.Ct. at 1692. The importance of this factor was also emphasized in *Sprague v. Fitzpatrick,* 546 F.2d 560, 564 (3d Cir. 1976), *cert. denied,* 431 U.S. 937, 97 S.Ct. 2649, 53 L.Ed.2d 255 (1977), where the District Attorney's "alter ego," the First Assistant Attorney, was terminated for criticizing the District Attorney. Here, Rode worked at essentially clerical tasks, the performance of which did not require her to work closely with her supervisors. In addition, the article most directly criticized personnel director Harhigh, who was separated from Rode in the chain of command.

The disruption of the workplace caused by Rode's speech is also relevant. *Connick,* 461 U.S. at 153, 103 S.Ct. at 1693. The news reporter interviewed Rode during non-work hours while she was at home. The defendants point to the disruption of the workplace when the *Paxton Herald* published the article. With respect to Rode's participation in the interview, we note that she did not seek it but that the newspaper reporter sought her out because of the public's concern with PSP employment practices. *Compare Connick,* 461 U.S. at 154, 103 S.Ct. at 1693 (only slight public interest inherent in employee's questionnaires). We thus must balance the interest of the public against the possible disruption in the workplace caused by the initial publication of the article. However, the defendants apparently did not consider the disruption caused by the initial publication serious, because the defendants themselves reproduced and disseminated the article in the workplace. *See Czurlanis,* 721 F.2d at 107. Thus, we conclude that under the circumstances, Rode's exercise of free speech did not impermissibly affect the State's interest in the efficiency and performance of the PSP. Rode is thus entitled to a determination of her damages.[4]

---

3. *See Bolden v. Penna. State Police,* 73–2604 (E.D.Pa.1973); *Oburn v. Shapp,* 393 F.Supp. 561, *aff'd* 521 F.2d 142 (3d Cir.1975); *Bolden v. Penna. State Police,* 491 F.Supp. 958 (1980).

4. Rode's claim for damages is predicated on her participation in protected speech, which speech was a substantial or motivating factor in her suspension. *See Czurlanis,* 721 F.2d at 103. Because her speech was protected and because the defendants do not suggest that she was not suspended for her speech or that she would have been suspended in any event, Rode is entitled to the amount of pay lost during her suspension. *Id.* at 107. Other damages claimed as

### III.

Rode also contends that the defendants allegedly retaliated against her by "(1) transferring her from the Personnel Bureau; (2) assigning her demeaning tasks; (3) failing to provide training and work assignments; (4) making derogatory statements about her to fellow employees; and (5) taking away her office and filing cabinet." *Rode,* 646 F.Supp. at 880 (footnote omitted). Rode claims that PSP predicated these actions on her relationship with her brother-in-law Hileman and his testimony in the *Clanagan* civil rights case against PSP.

As a matter of logic, Rode must meet both legal and evidentiary requirements in asserting a cognizable cause of action to challenge the defendants' employment decisions. First, she must marshal sufficient facts to show that her employee problems are in some way related to Hileman's testimony. Second, she must identify a cause of action capable of affording her relief.

Rode has presented evidence to show that her objective job performance ratings rapidly declined after Hileman testified in the *Clanagan* litigation in August 1982. Further, not long after his testimony, her superiors transferred her to a position with less responsibility and less favorable working assignments and conditions. Rode's relationship with Hileman provides the nexus for her contention that there is some causal connection between his testimony on behalf of a black police lieutenant in hotly contested legal proceedings and her harassment. Analogizing to the more typical employment discrimination case, Rode arguably has presented a prima facie case suggesting the treatment accorded her related to Hileman's testimony. *Cf. Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (employment discrimination under Title VII); *Chipollini v. Spencer,* 814 F.2d 893 (3d Cir.1987) (in banc) (employment discrimination under ADEA), *cert. dismissed,* —— U.S. ——, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987).

Like the ordinary defendant in an employment discrimination case, the defendants here have contested this prima facie case by asserting legitimate business reasons for each challenged job action. *Cf. Chipollini,* 814 F.2d at 899. They contend that Rode's transfer was premised on her inability to adjust to a departmental reorganization and her personality conflicts with her supervisor. They argue that her new assignments and conditions were related to the length of time required to establish a new position for Rode. Finally, the defendants challenge the inference that the employment actions were related to Hileman's testimony, asserting that Rode's relationship with her superiors had declined even before Hileman had been subpoenaed in August 1982. The defendants thus have attempted to rebut Rode's prima facie case by pointing to evidence supporting a nondiscriminatory motive.

Rode, in turn, counters by attempting to show that the defendants' proffered legitimate rationale for her treatment is in fact pretextual. *Cf. Chipollini,* 814 F.2d at 899. She notes that she contemporaneously challenged the accuracy of each of the negative evaluations given after Hileman's testimony. She supports the inference that her employment problems were related to Hileman's testimony by pointing to the "excellent" performance rating she received in April 1982. It seems clear that we thus have a question of fact and a credibility issue sufficient to assist a motion for summary judgment. *Cf. Jackson v. University of Pittsburgh,* 826 F.2d 230, 234–35 (3d Cir. 1987) (issue of credibility created under Title VII where discharged employee challenges basis of employer criticism of performance), *cert. denied,* —— U.S. ——, 108 S.Ct. 732, 98 L.Ed.2d 680 (1988); *Chipollini,* 814 F.2d at 900 (inconsistencies in employer's proffered reason for discharge might support inference of pretext).

Rode's difficulty is not with establishing the necessary factual basis to support an inference that the defendants' actions were related to Hileman's testimony. Rather, the problem with Rode's claim is her fail-

a result of Rode's suspension, if any, remain a jury question. *Id.* at 107–08.

ure to find a legal vehicle to carry her factual argument. The personnel decisions of state employers are not ordinarily subject to challenge in federal court. A claimant must challenge state employment actions based either on an asserted violation of constitutional rights or upon a violation of a federal statute.

Rode has attempted to mold her basic factual argument into two different causes of action. She first argues that she may assert a cause of action under 42 U.S.C. § 1983 because the defendants' actions violated her constitutional rights to freedom of association and equal protection. She then argues that she may bring a cause of action under 42 U.S.C. § 1985 because she was injured in the course of a conspiracy by the defendants to intimidate Hileman, who was a witness in a separate pending federal court action.

### A. Freedom of Association

■ Rode argues that she has a valid cause of action under section 1983 because the defendants violated her right to freedom of association. She contends that the defendants engaged in the course of retaliatory harassment described above in violation of the first amendment to deter her from associating with Hileman.[5] The defendants argue that Rode failed to present evidence that her relationship with Hileman was a close one protected by the amendment. The district court entered summary judgment for the defendants on this claim, holding that "Rode's relationship with her brother-in-law is not entitled to first amendment protection." *Rode*, 646 F.Supp. at 881.

Government employment does not require an employee to forego the exercise of the right to freedom of association. *Wilson v. Taylor*, 733 F.2d 1539, 1542 (11th Cir.1984). Employees, however, who claim that adverse employment action was taken against them based upon the exercise of their associational rights must show that they were engaged in constitutionally protected conduct, which conduct was a "substantial" or "motivating factor" in the government employer's decision. *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. at 287, 97 S.Ct. at 576.

Two sometimes overlapping types of protected association have been recognized: associations founded on intimate human relationships in which freedom of association is protected as a fundamental element of liberty, and associations formed for the purpose of engaging in activities protected by the first amendment, such as the exercise of speech, assembly, and religion. *Roberts v. United States Jaycees*, 468 U.S. 609, 617–18, 104 S.Ct. 3244, 3249, 82 L.Ed.2d 462 (1984). Rode asserts that her relationship with Hileman was protected as an intimate association; she does not claim that she and Hileman banded together for the purpose of engaging in other protected activities.

Although the precise boundaries of this protection are unclear, it seems that at least some family relationships fall within its ambit. For "[f]amily relationships, by their nature, involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctly personal aspects of one's life." *Id.* at 619–20, 104 S.Ct. at 3250. Yet, not all family relationships are likely to be of similar character. Thus, in determining whether a particular association is sufficiently personal or private to warrant constitutional protection, factors such as size, purpose, selectivity, and the exclusion of others from the critical aspects of the relationship are to be considered. *Board of Directors of Rotary International, et al. v. Rotary Club of Duarte*, —— U.S. ——, ——, 107 S.Ct. 1940, 1945, 95 L.Ed.2d 474 (1987). Only relationships "distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the af-

---

5. As additional support for this construction of the facts, Rode notes that Personnel Director Harhigh instructed all members of the bureau to refrain from speaking with Hileman. Rode also asserts that Harhigh told another individual that Rode was carrying information back to her brother-in-law.

filiation, and seclusion from others in critical aspects of the relationship" are likely to implicate protection. *Roberts,* 468 U.S. at 620, 104 S.Ct. at 3250.

An application of these principles to the present facts yields the conclusion that Rode's relationship with her brother-in-law was not of the sort afforded special constitutional protection. Her relationship with Hileman was neither "selected," *compare Wilson v. Taylor,* 733 F.2d 1539, 1544 (11th Cir.1984) (dating relationship protected), nor bound by blood, *see Trujillo v. Bd. of Cty. Comm'rs of City of Santa Fe,* 768 F.2d 1186, 1188–89 (10th Cir.1985) (relationship with son or brother protected). Nor would her assertion that she and Hileman were "good friends" appear sufficient to invoke protection where their relationship was not based on the "creation and sustenance of a family." *Roberts,* 468 U.S. at 619, 104 S.Ct. at 3250. Thus, Rode's freedom of association claim fails as a matter of law. We believe that the district court correctly determined that Rode's association with her brother-in-law was not constitutionally protected.

### B. Equal Protection Claim

■ Rode next contends that the defendants retaliated against her because of her association with a supporter of racial minorities. The district court apparently rejected this claim because the defendants' retaliatory actions did not deprive Rode of a property interest. *Rode,* 646 F.Supp. at 880. Employment decisions such as those at issue here, which do not terminate or abridge Rode's employment contract, and which could be litigated in state tribunals, do not constitute deprivations of property interests under the fourteenth amendment. *Cf. Brown v. Brienen,* 722 F.2d 360, 364–65 (7th Cir.1983) (employment decisions which *do* violate employment contract may not form basis for suit under section 1983). "[T]he Constitution must not be trivialized by being dragged into every dispute in state and local government." *Id.* at 365.

Nonetheless, a pattern of harassment not implicating an employee's property rights may constitute a fourteenth amendment violation where it is motivated by the employee's exercise of protected constitutional rights or by invidious discriminatory intent. *See, e.g., Bennis v. Gable,* 823 F.2d 723, 731 (3d Cir.1987) (demotion actionable where motivated by employee's exercise of first amendment rights).

■ Rode's equal protection clause argument ultimately fails because she has not asserted that she is a member of a protected class. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) (elements of employment discrimination under Title VII). Rode admits that she is not a member of a racial minority. She relies instead upon that line of cases which suggests that supporters of racial minorities may be protected from retaliatory treatment. *Cf. Richardson v. Miller,* 446 F.2d 1247, 1249 (3d Cir.1971) (42 U.S.C. § 1985(3) racial animus requirement met where plaintiff is a supporter of blacks); *Waller v. Butkovich,* 584 F.Supp. 909, 937 (M.D.N.C.1984).

Rode, however, does not present any evidence to suggest that she was perceived as a supporter of minorities or that she in fact supported them. She relies only on evidence of harassment due to her association with someone perceived as such a supporter. We hold that this attenuated connection by a person not a member of and not perceived as a supporter of minorities is insufficient to accord a person protection from discriminatory treatment based on racial animus or prejudice. Rode's section 1983 action based upon a violation of the equal protection clause therefore fails.[6]

### C. Rode's Section 1985 Claim

Finally, Rode attempts to arrange her constellation of allegations to structure a cause of action under 42 U.S.C. § 1985(2). In count II of her complaint, Rode asserts that "[t]he harassment of and disciplinary actions against [her] resulted from a conspiracy of the Defendants to deter Plaintiff

---

**6.** The defendants argue that Rode fails to allege disparate treatment. In light of our disposition of the equal protection contention, we need not reach this issue.

Hileman by intimidation and threat from appearing in the legal action of Lieutenant Clanagan or in any other legal action against the PSP." In this arrangement of the facts, Rode's relationship with Hileman, although unprotected, provides the motivation for the defendants' alleged harassment.

Neither the district court nor the parties apparently considered the validity of Rode's section 1985 claim independently from her section 1983 claim. The court disposed of both the equal protection and the section 1985 counts because Rode suffered no deprivation of property under the fourteenth amendment. *Rode*, 646 F.Supp. at 879–80. The parties have not independently briefed this issue on appeal.

 We treat Rode's section 1985 claim separately because it invokes a different analysis. Consideration of the claim requires us to determine whether Rode has standing to assert a claim under section 1985 when she was neither a party nor a witness in the *Clanagan* action. We conclude that Rode cannot assert an action under section 1985(2) as a matter of law.

Section 1985 was passed as part of the Civil Rights Act of 1871, and like its better known cousin, section 1983, it lay dormant until recent years. Section 1985(2) states in part that a cause of action will lie

> [i]f two or more persons ... conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such a party or witness in his person or property on account of his having so attended or testified.

42 U.S.C. § 1985(2). The remedial portion of section 1985 is actually found in subdivision (3):

> [I]n any case of conspiracy set forth in this section, if one or more persons engaged therein do ... any act in furtherance of the object of such conspiracy, whereby another is injured in his person

or property, ... the party so injured ... may have an action for the recovery of damages occasioned by such injury or deprivation against any one or more of the conspirators.

*See Kush v. Rutledge,* 460 U.S. 719, 724, 103 S.Ct. 1483, 1487, 75 L.Ed. 413 (1983) ("the civil remedy for a violation of any of the subsections is found at the end of § 1985(3)").

Section 1985(2) provides a cause of action based on the intimidation of witnesses in a federal court action.

> "[T]he essential allegations of a 1985(2) claim of witness intimidation are (1) a conspiracy between two or more persons (2) to deter a witness by force, intimidation or threat from attending court or testifying freely in any pending matter, which (3) results in injury to the plaintiffs."

*Malley–Duff & Associates v. Crown Life Ins. Co.,* 792 F.2d 341, 356 (3d Cir.1986) (quoting *Chahal v. Paine Webber,* 725 F.2d 20, 23 (2d Cir.1984)), *aff'd,* — U.S. —, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). The provision applies to discovery proceedings as well as to an actual trial.[7] *Malley–Duff,* 792 F.2d at 355.

Prior interpretations of section 1985(2) have been almost uniformly limited to situations in which a party sought to recover for the intimidation of his or her witnesses. In *Brawer v. Horowitz,* for example, the plaintiffs were individuals who had been convicted in a prior criminal trial in which, they alleged, the prosecution had conspired with others to present perjured testimony. 535 F.2d at 832. In *Malley–Duff,* a plaintiff sought recovery for the intimidation of its witnesses. 792 F.2d at 355; *see also Kush,* 460 U.S. at 719, 103 S.Ct. at 1483 (plaintiff in federal action claims that defendants engaged in conspiracy to intimidate his witnesses); *Chahal,* 725 F.2d at 24 (plaintiff claims intimidation of expert witness); *McCord v. Bailey,* 636 F.2d 606

---

7. This portion of section 1985(2) was promulgated under the broad federal authority to protect the processes of federal courts and does not require a plaintiff to show any class-based animus. *Kush,* 460 U.S. at 726–28, 103 S.Ct. at

1487–88; *Brawer v. Horowitz,* 535 F.2d 830, 840 (3d Cir.1976); *compare Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971) (class-based animus requirement found in section 1985(3)).

(D.C.Cir.1980) (defendant in prior criminal case sues prior attorneys for witness intimidation), *cert. denied,* 451 U.S. 983, 101 S.Ct. 2314, 68 L.Ed.2d 839 (1981).

The Ninth Circuit Court of Appeals has relied upon the *Chahal* summary of section 1985(2) to hold that an intimidated witness could not bring an action for damages under that section because she was not a party:

> Allegations of witness intimidation under § 1985(2) will not suffice for a cause of action unless it can be shown the *litigant* was hampered in being able to present an effective case. Since David has not shown she was a party to the actions in which she was intimidated, she can show no injury under § 1985(2).

*David v. United States,* 820 F.2d 1038, 1040 (9th Cir.1987); *but see Hoopes v. Nacrelli,* 512 F.Supp. 363, 368 (E.D.Pa.1981) (intimidated witness has standing); *Kelly v. Foreman,* 384 F.Supp. 1352, 1353 (S.D. Texas 1974) (same); *Crawford v. City of Houston,* 386 F.Supp. 187, 192 (S.D.Texas 1974) (same).

Rode, however, was neither a witness nor a litigant in a proceeding in the federal court. Moreover, she makes no claim that she was intimidated or hampered from being a witness. She contends only that she suffered an injury in the course of a conspiracy to intimidate Hileman indirectly as a witness in the *Clanagan* case. She does not allege that Clanagan sustained any injury as a result of her alleged harassment or that the integrity of the federal court proceedings has been impugned or affected by the alleged conspiracy. To accord Rode standing under such circumstances would require us to extend section 1985(2)'s protection beyond the parties or even the witnesses to the federal suit. We are not cited to, nor does our own independent research reveal, any authority to justify

the adoption of such a broad interpretation of section 1985(2) and we decline to do so. Rode's section 1985(2) cause of action thus must be rejected as a matter of law.[8]

## IV.

Finally, Rode contends that the district court erred in dismissing defendants Thornburgh and Zimmerman from the suit. On review, the allegations in Rode's complaint must be accepted as true and the complaint must be construed in the light most favorable to Rode. *Gomez v. Toledo,* 446 U.S. 635, 636 n. 3, 100 S.Ct. 1920, 1921 n. 3, 64 L.Ed.2d 572 (1980).

Rode asserts that Governor Thornburg was a proper defendant in the "retaliation" portion of her suit under sections 1983 and 1985(2) because of his awareness of, and acquiescence in, her retaliatory harassment. She also argues that Thornburgh and Attorney General Zimmerman are necessary parties to her challenge to the constitutionality of the PSP administrative regulations. These contentions have no merit.

A defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior. Parratt v. Taylor,* 451 U.S. 527, 537 n. 3, 101 S.Ct. 1908, 1913 n. 3, 68 L.Ed.2d 420 (1981); *Hampton v. Holmesburg Prison Officials,* 546 F.2d 1077, 1082 (3d Cir.1976). Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence. Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity. *Compare Boykins v. Ambridge Area School District,* 621 F.2d 75, 80 (3d Cir. 1980) (civil rights complaint adequate

---

8. The district court's decision was predicated on a finding that a section 1985(2) claim requires termination of a property interest. Section 1985, however, gives a cause of action to an individual who has been "injured in his person or property...." 42 U.S.C. § 1985(3) (1982). Here, Rode alleged injuries to her person.

We do not reach the issue of whether the retaliation against Rode rose to the level of

"force, intimidation, or threat" contemplated under section 1985(2). *See, e.g.,* Comment, *Section 1985(2) Clause One and Its Scope,* 70 Cornell L.Rev. 756 (1985) (suggesting that this requirement be strictly construed); *Keating v. Carey,* 706 F.2d 377, 391–92 (2d Cir.1983) (Meskill, J., concurring and dissenting).

where it states time, place, persons responsible); *Hall v. Pennsylvania State Police*, 570 F.2d 86, 89 (3d Cir.1978) (same).

■ Here, Rode's retaliatory harassment claim against Governor Thornburgh was precluded by her failure to allege knowledge and acquiescence with the required particularity. Rode's assertion that the Governor had "responsibility for supervising" the other defendants is irrelevant. Further, Rode failed to show that the Governor had the necessary personal knowledge to sustain the civil rights action as to him. Rode's actions were built upon the hypothesis that defendant Thornburgh had personal knowledge of the retaliatory harassment directed against Hileman because of numerous articles that appeared in newspapers throughout the state and through the introduction of a legislative resolution seeking an investigation into racially motivated retaliation against PSP employees, the filing of grievances with the Governor's office of administration, and telephone calls and correspondence with the office of the Lieutenant Governor.

Rode also alleges that defendant Thornburgh had personal knowledge of her harassment as a result of grievances she filed with his office of administration. These allegations are simply insufficient to show that Governor Thornburgh had actual knowledge of Rode's alleged harassment. In a large state employing many thousands of employees, a contrary holding would subject the Governor to potential liability in any case in which an aggrieved employee merely transmitted a complaint to the Governor's office of administration or to the Lieutenant Governor's office.

Rode also contends that the district court erred in dismissing her complaint as to the Governor and Attorney General with respect to the constitutionality of the PSP administrative regulations. Rode notes that the Court in *Ex Parte Young* held that state officers with "some connection" with the enforcement of a law were appropriate parties in actions seeking to determine the constitutionality of that law. 209 U.S. 123, 157, 28 S.Ct. 441, 453, 52 L.Ed. 714 (1908). She contends that both the Governor and

Attorney General had the requisite connection with enforcement here where they both had the power to review and approve PSP regulations, and where the Governor had the ultimate responsibility for the enforcement of those regulations.

■ The district court properly dismissed the action against Zimmerman and Thornburgh. The Governor and Attorney General both have similar powers to review and approve for form and legality all proposed rules and regulations of executive agencies. 71 Pa.S.A. § 732–301 (Governor); 71 Pa.S.A. § 732–204(b) (Attorney General); *Zimmerman v. O'Bannon*, 497 Pa. 551, 558, 442 A.2d 674, 678 (1982) (power of attorney general). The power to review and approve a departmental regulation for form and legality, however, does by no means charge the Governor and Attorney General with the duty to enforce that regulation. Rode also contends that the Governor is an appropriate defendant because he has "ultimate responsibility for the enforcement of the regulations of the PSP," citing to *Allied Artists Pictures Corp. v. Rhodes*, 473 F.Supp. 560, 568 (S.D. Ohio 1979) (*Allied I*). The court in *Allied I* held that *Young* permitted a plaintiff to bring an action challenging a state law naming as a defendant a Governor with the general duty to enforce the laws. The court limited this holding to those cases in which there was a "real, not ephemeral, likelihood or realistic potential that the connection will be employed against the plaintiff's interests." *Id.* at 568. Here, there is no realistic potential that the Governor's general power to enforce the laws of the state would have been applied to a departmental regulation against a PSP administrative assistant.

Further the court in *Allied* was concerned with a primarily self-enforcing statute. *Allied Artists Pictures Corp. v. Rhodes*, 496 F.Supp. 408, 425–26 (S.D.Ohio 1980) (*Allied II*), aff'd in part, remanded in part on other grounds, 679 F.2d 656 (6th Cir.1982). The plaintiff would have been barred from challenging the statute by the eleventh amendment unless it could name the Governor as a defendant. Here,

there is no reason to strain the *Young* doctrine to reach Governor Thornburgh as Rode was able to challenge the constitutionality of the regulation by naming PSP administrators Cochran and Dellarciprete.[9]

## V.

In summary, we will affirm the order of the district court dismissing the plaintiff's complaint against the Governor and Attorney General of the Commonwealth of Pennsylvania. We will affirm the summary judgment entered in favor of the defendants on the plaintiff's claims under section 1983 and section 1985 relating to retaliation and conspiracy. We vacate the summary judgment, however, with respect to plaintiff's claim that her suspension from employment was impermissible because it violated her constitutional rights to the exercise of freedom of speech. As to this claim, the judgment will be vacated and the case remanded to the district court for further proceedings consistent with this opinion.

Each side to bear its own costs.

## A. LEON HIGGINBOTHAM, Jr., Circuit Judge, dissenting in part.

Although I agree with much of the majority's opinion,[1] we part company in analyzing the legal basis for appellant's claim under 42 U.S.C. § 1983 (1982). The majority's decision to affirm the entry of summary judgment for appellees on this claim

devalues the constitutional protection of the intimate associations of family members. I believe that fidelity to a fundamental strand of constitutional law requires reversal of this aspect of the district court's summary judgment. Because the majority denies appellant a trial on the viable legal basis for her § 1983 action, I respectfully dissent.

Appellant Vivian M. Rode, a white woman, claims that she became a victim of workplace discrimination because her brother-in-law Jay C. Hileman, who also is white and was a state employee at the time in question, testified for the black plaintiff class in a successful federal employment discrimination action against the Pennsylvania State Police. The district court, noting its inability to find any court holding that a sibling relationship is protected association under the first amendment,[2] "conclude[d] that Rode's relationship with her brother-in-law is not entitled to First Amendment protection." *Rode v. Dellarciprete*, 646 F.Supp. 876, 881 (M.D.Pa.1986). The majority agrees, explaining that Rode's relationship to Hileman does not fit the typology of relationships that have been "afforded special constitutional protection" by federal courts. Maj. typescript at 21. This is so, according to the majority, because an "in-law" relationship is not "'selected,'" not "bound by blood," and not "based on the 'creation and sustenance of a family.'" *Id.* (citation omitted).

---

**9.** It would also appear that Rode's claim against Thornburgh and Zimmerman fails to meet the case and controversy requirement. *See Shell Oil Co. v. Noel,* 608 F.2d 208 (1st Cir.1979) (no case or controversy between parties unless state officer has taken or threatened to take action under the challenged statute).

**1.** In particular, I join the majority's legal determinations (1) that appellant is entitled to damages for her suspension from service, (2) that the equal protection clause does not provide a basis for appellant's claim under 42 U.S.C. § 1983 (1982), (3) that the district court properly granted summary judgment for appellees on appellant's claim under 42 U.S.C. § 1985 (1982), and (4) that the district court properly dismissed appellant's claims against defendants Richard Thornburgh and Leroy S. Zimmerman.

**2.** In this regard, the district court relied on its unpublished opinion, *Cole v. Allied Servs. for the Handicapped,* Civil No. 85–1851 (M.D.Pa. June 13, 1986) [Available on WESTLAW, 1986 WL 12800]. *Rode v. Dellarciprete,* 646 F.Supp. 876, 881 (M.D.Pa.1986). In *Cole,* the district court was "'not persuaded ... that [a man's] interest in associating with his brother rises to the same level of importance as decisions relating to marriage, childbirth, and childrearing.'" *Id.* (quoting *Cole* ). The district court also noted that it "'found no cases which have held that the relationship between brothers is entitled to this sort of protection and [it] decline[d] to be the first.'" *Id.* (same).

Since the district court's decision in the present case, we have affirmed by judgment order its *Cole* decision. *Cole v. Allied Servs. for the Handicapped Inc.,* 815 F.2d 693 (3d Cir.1987) (table).

At the threshold, I strongly disagree with the majority's formalistic approach to this legal question. Unlike the majority's short checklist of categories, the Supreme Court's explanations of the constitutionally-protected "freedom of private association," *Board of Directors of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. ——, 107 S.Ct. 1940, 1945, 95 L.Ed.2d 474 (1987) ("*Rotary Club*"), have "not attempted to mark ... precise boundaries...." *Id.* Instead, the Court has called for "a careful assessment of where [a] relationship's objective characteristics locate it on a spectrum from the most intimate to the most attenuated of personal attachments." *Roberts v. United States Jaycees*, 468 U.S. 609, 620, 104 S.Ct. 3244, 3251, 82 L.Ed.2d 462 (1984). To aid this process of careful assessment, the Court has "note[d] only that factors that may be relevant include size, purpose, policies, selectivity, congeniality, and other characteristics that in a particular case may be pertinent." *Id.; accord Rotary Club*, 107 S.Ct. at 1946. The Court has never even implied, much less held as a matter of law, that certain categories of personal association are *per se* unprotected. Indeed, the Court has not even applied that designation to relationships that "involve[ ] the participation of strangers....," *Roberts*, 468 U.S. at 621, 104 S.Ct. at 3251; *accord Rotary Club*, 107 S.Ct. at 1946, "such as a large business enterprise...." *Roberts*, 468 U.S. at 620, 104 S.Ct. at 3251. The Court has merely noted that such associations "seem[ ] remote from the concerns giving rise to this constitutional protection." *Id.*

The majority's evaluation of Rode's claim that her relationship with her brother-in-law is constitutionally protected seems to begin and end, as did the district court's, with the realization that there is no federal appellate decision directly on-point. A better approach, I believe, is to assess the status of "in-law" association in light of the pertinent factors that the Supreme Court identified in *Roberts* and *Rotary Club*.

A consideration of these factors leads me to conclude that an "in-law" relationship may be constitutionally protected.[3] Such a relationship is certainly small in size. Even if one makes extreme assumptions (*e.g.*, that Rode has ten sisters, each of whom will marry twice), any woman will have a rather small number of brothers-in-law during the course of her lifetime, and her relationship with each of them is or will be, by definition, one-on-one. In addition, the purpose of any "in-law" relationship obviously derives from the purpose of marriage itself, which

> is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred. It is an association that promotes a way of life, not causes; a harmony in living, not political faiths; a bilateral loyalty, not commercial or social projects[;] ... an association for a[ ] noble ... purpose....

*Griswold v. Connecticut*, 381 U.S. 479, 486, 85 S.Ct. 1678, 1682, 14 L.Ed.2d 510 (1965). Finally, an "in-law" relationship is certainly selective, at least in the sense that "in-laws" may not always be categorized as "strangers." An "in-law" relationship is produced when at least two people make a discriminating choice of life partners. Such a relationship is also, if I understand the majority's use of the term, "selected," for a significant factor in a decision to marry can be one's assessment of his or her prospective "in-laws," the parents and the siblings. In sum, the relevant factors indicate that Rode's relationship with Hileman stands, on the constitutional spectrum, quite near the association that legally produced it: her sister's marital relationship with Hileman, which is at the core of constitutional protection.

Notwithstanding all the well-worn jokes about "in-laws," we must remember that "[t]he life of the law has not been logic: it has been experience." O. Holmes, *The Common Law* at 1 (1881). Experience teaches us that all mothers-in-law are not

---

**3.** Neither the district court nor the majority claim that, as a factual matter, Rode's particular relationship with Hileman is unprotected against state action. Instead, each court has reached only a legal holding: no one may claim that a relationship with his or her "in-law" is protected association under the first and fourteenth amendments.

ogres, and that all sisters-in-law are not, to each other, strangers. It also teaches us that some "in-laws" can be as close as any blood relatives. Viewed from the perspective of an oppressor who wishes to retaliate against the intimate associates of an innocent person, retaliatory conduct against a sister-in-law can be as intentional, vengeful and cruelly effective as would be acts perpetrated against the innocent's wife. The majority seems to forget that Rode is the blood sister of Hileman's wife. Whatever the quality of their relationship, we cannot assume that she views her sister as a stranger. Moreover, it is naive to assume that, once Rode became a victim of allegedly deliberate, harsh treatment in response to Hileman's truthful testimony in a discrimination trial, Rode's sister would be indifferent. The majority seems to agree that, if Rode was Hileman's wife or sister, she would have a cause of action under § 1983 for the alleged retaliatory conduct. From my view, the fact that Rode is "only" Hileman's sister-in-law makes no constitutional difference.

For all these reasons, I believe that, as a legal matter, the majority's conclusion is simply wrong. *See generally Lyng v. International Union, United Auto. Aerospace & Agricultural Implement Workers of Am.*, — U.S. —, —, 108 S.Ct. 1184, 1187–88, 99 L.Ed.2d 380 (1988) (evaluating the associational rights of " 'close relatives' ") (quoting *Lyng v. Castillo*, 477 U.S. 635, 638, 106 S.Ct. 2727, 2729, 91 L.Ed.2d 527 (1986)); *Moore v. East Cleveland*, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (plurality opinion) (right to cohabitation with one's relatives); *Trujillo v. Board of County Comm'rs of the County of Santa Fe*, 768 F.2d 1186, 1189 (10th Cir.1985) (mother and sister have constitutionally-protected interests in their relationships with, respectively, their son and brother); *Wilson v. Taylor*, 733 F.2d 1539, 1543–44 (11th Cir.1984) ("simply dating" creates a relationship protected under the first amendment freedom of association); *cf. Smith v. Department of Public Health*, 428 Mich. 540, 410 N.W.2d 749 (1987) (defendants entitled to judgment, in action alleging denial of promotion by state police because plaintiff's brother was a "student activist," because the state is not a "person" for purposes of a damages suit under § 1983), *cert. granted sub nom. Will v. Michigan Dep't of State Police*, — U.S. —, 108 S.Ct. 1466, 99 L.Ed.2d 696 (1988). Accordingly, I dissent.