DLD-167                                    NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-3668
_____

GREGORY ALTENBACH,
                                        Appellant
v.

TONI IANUZZI, Nurse Practitioner; PHYSICIAN JOHN LISIAK;
PHYSICIAN JOSE BOGGIO;
PHYSICIANS ASSISTANT NICHOLLE BOGUSLAW;
KAREN HOLLY, Registered Nurse Supervisor; PHYSICIAN ANDREW J. DANCHA;
PHYSICIANS ASSISTANT MARIA LEAHY;
WEXFORD HEALTH SOURCES INC, Prison Healthcare provider
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civil No. 3-14-cv-01932)
District Judge: Honorable Robert D. Mariani
_____

Submitted for Possible Dismissal Pursuant to 28 U.S.C. § 1915(e)(2)(B)
or Summary Action Under Third Circuit L.A.R. 27.4 and I.O.P. 10.6
March 3, 2016
Before: CHAGARES, GREENAWAY, JR. and SLOVITER, Circuit Judges

(Opinion filed: April 7, 2016)
_____

OPINION*
_____

PER CURIAM

---

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not
constitute binding precedent.

Pro se appellant Gregory Altenbach appeals from the judgment of the United States District Court for the Middle District of Pennsylvania in his § 1983 action. As the appeal does not present a substantial question, we will summarily affirm the decision of the District Court.

I.

Altenbach initiated this § 1983 action in 2014 against various medical personnel from SCI-Mahanoy and SCI-Benner Township, alleging that these Defendants denied him adequate medical care in connection a shoulder injury he suffered while exercising.

Altenbach claims that he was initially treated at sick call on May 22, 2013 by Defendant Nurse Practitioner Tony Ianuzzi, complaining of pain, stiffness, and weakness in his right shoulder resulting from an exercise injury. Altenbach claims that he had a fist-sized depression in his shoulder, and that Ianuzzi diagnosed it as a strain and prescribed muscle rub and Naprosyn. Altenbach returned to sick call on June 12, 2013 with his shoulder "feeling worse" and requested stronger medication, treatment by a doctor, and an order that he be handcuffed only in the front. Altenbach claims Ianuzzi denied all of these requests, stating they were "not needed."

Altenbach returned again on June 27, 2013, and was seen by Defendant Physician Jose Boggio. Altenbach claims that Boggio denied the same requests he made two weeks earlier to Ianuzzi, but that Boggio acknowledged that his shoulder has "either atrophied or shriveled up somewhere it shouldn't be." Altenbach returned two days later and was seen this time by Defendant Physician Assistant Nicholle Boguslaw, at which time he

2

offered the same complaints and requests previously made to Boggio and Ianuzzi. Boguslaw noted that his shoulder "*may* have a deformity" and indicated he would be "pulled out to triage for further evaluation."

On July 7, 2013, Altenbach was treated again by Ianuzzi, at which time Altenbach renewed his complaints of pain and stiffness and also renewed his previous requests. Ianuzzi allegedly advised him that there was "no need" for these requests because he would be x-rayed soon and provided stronger medication. Altenbach was x-rayed five days later and the report indicates the presence of "bone demineralization," but concludes that "there is no radiographic evidence of acute disease in the right shoulder." Ten days after the x-rays, Altenbach was again seen by Ianuzzi, at which time Ianuzzi allegedly denied Altenbach's renewed requests and advised him that the x-rays did not reveal a trauma injury. Ianuzzi administered a steroid injection the following day.

Four days after receiving the injection, on July 27, 2013, Altenbach was seen by Defendant Physician John Lisiak and advised Lisiak of his increasing pain, his belief that currently prescribed medications were not working, and his desire to be handcuffed only in the front. Lisiak examined Altenbach's shoulder and noted an "apparent atrophy . . . below the scapula," and also increased Altenbach's dose of Naprosyn.

Less than two weeks later, Altenbach was seen again by Ianuzzi, who again denied his previous requests, but advised Altenbach that he might be referred to physical therapy. The next day Ianuzzi prescribed a liquid pain-killer. Four days later, Dr. Lisiak re-examined Altenbach and allegedly advised him that potential treatments were limited

because the injury was "months old," and that an MRI, not an x-ray, should have been ordered because the "problem was related to muscle, not the bone." This statement is not present in the medical records.

A week later, on August 17, 2013, Altenbach was treated again by Boguslaw, who observed a "muscular deformity of [the] scapular region" and noted that "PT [was] ordered though RHU states is difficult to transport." She also noted: "consider MRI if atrophy not improved [with] PT." On August 25, 2013, Boguslaw noted that "PT has been denied per inmate" and prescribed Altenbach Trixacin, a pain-relieving cream. Altenbach was transferred to SCI-Benner Township on September 2, 2013.

Ten days after arriving, Altenbach went to sick call and was seen by Defendant Physician Andrew Dancha, who noted a "concave defect in scapular region" and indicated he would review Altenbach's records with Defendant Physician Assistant Maria Leahy. The next day Altenbach was examined by Leahy, who observed "muscle atrophy" and recommended physical therapy and a possible MRI. According to Altenbach, she also advised him that "because [SCI] Mahanoy didn't actually do anything to treat the problem . . . the length of time that's passed since the actual injury . . . severely limits treatment." There is no record of this statement in the medical records.

About forty days later, on October 23, 2013, Altenbach was seen by a physical therapist, who observed "obvious muscle atrophy," and issued Altenbach a physical therapy plan. Three weeks later, Altenbach went to sick call and advised Defendant Physician Assistant Laura Dunkle that the physical therapy was ineffective. Dunkle

4

advised him he would be referred to an orthopedic specialist and for stronger pain meds. A week later, on November 21, 2013, Altenbach was again seen by Dancha, who allegedly advised Altenbach that his injury was permanent, but prescribed Prednisone and Nortriptyline, an anti-depressant. Dancha also administered a pain-killing injection on December 12, 2013.

On February 14, 2014, Altenbach was seen again by Leahy, who advised Altenbach to continue the physical therapy regimen and allegedly advised him "the range of motion will possibly correct itself." On March 17, Dunkle prescribed Zostrix cream for pain and advised Altenbach that "some discomfort is likely no matter what pain meds are issued." On April 9, 2014, Dancha examined Altenbach and noted the depression in his shoulder was still present and prescribed Motrin for pain. Dancha saw Altenbach again on May 18, 2014, and Dancha noted that the Nortriptyline was helping his discomfort.

On July 1, 2014, Dancha ordered an MRI, which was performed on July 7, 2014. The radiologist reviewing the MRI found that "the supraspinatus muscle is moderately severely atrophied." Altenbach alleges that Dancha later reported, after reviewing the MRI results, that he had an "uncommon" nerve injury in his shoulder, and his treatment prognosis would have been better had the injury been detected earlier. This statement is not present in any of the medical records. On July 22, 2014 Dancha ordered another physical therapy consultation, and on August 20, 2014, Altenbach was seen by a physical therapist, who allegedly advised him that his "shoulder looked better than the first time."

5

On October 30, 2014, Dancha referred Altenbach for an Electromyogram study, which was performed on January 7, 2015. The report concluded that "this study is consistent with a significant, active right suprascapular neuropathy, especially involving the branch to the infraspinatus muscle."

In the meantime, on July 4, 2013, Altenbach began filing numerous grievances related to his medical treatment, many of which Defendant Resident Nurse Supervisor Karen Holly denied. Altenbach does not allege that Holly was otherwise personally involved in his treatment, or treatment decisions.

On September 25, 2015, the District Court granted Holly's 12(b)(6) motion to dismiss, finding, among other things, that she lacked sufficient personal involvement in the complained-of conduct. In the same order, the Court also granted the Medical Defendants'[1] motion for summary judgment, finding that they provided Altenbach substantial care and that his claims amount to an improper attempt to second-guess the adequacy of treatment. Altenbach filed a timely notice of appeal from this order on October 29, 2015.[2]

## II.

We have jurisdiction under 28 U.S.C. § 1291. We review the District Court's dismissal under Rule 12(b)(6) using the same test that the District Court should have applied and ask whether the complaint contains "sufficient factual matter; accepted as

---

[1] "Medical Defendants" refers to all defendants except Karen Holly.
[2] Altenbach delivered his notice to prison officials at SCI-Camp Hill on October 23, 2015.

6

true; to state a claim to relief that is plausible on this face." <u>Fantone v. Latini</u>, 780 F.3d 184, 186-193 (3d Cir. 2015) (citing <u>Ashcroft v. Iqbal</u>; 556 U.S. 662 678 (2009)). We also exercise plenary review over the District Court's award of summary judgment and apply the same test the District Court should have utilized – whether the record "shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." <u>Giles v. Kearney</u>, 571 F.3d 318, 322 (3d Cir. 2009). In applying this test, we must accept evidence presented by the non-movant as true and draw all justifiable factual inferences in his favor. <u>Id</u>. We may summarily affirm any decision of the District Court where "it clearly appears that no substantial question is presented or that subsequent precedent or a change in circumstances warrants such action." 3d Cir. I.O.P. 10.6 (2015).

The District Court accurately observed that the complaint fails to set forth any specific allegations against Defendant Holly, let alone allegations that she was personally involved in any of Altenbach's treatment, or treatment decisions. To the extent that Altenbach's claim is based on Holly's failure to direct or supervise subordinate medical staff, the District Court correctly dismissed it as an improper theory of liability. <u>See</u> <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 676 (2009) ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*."). To the extent that his claim is based on Holly's alleged failure to satisfactorily resolve his grievances, the District Court was similarly correct in dismissing it. <u>See</u> <u>Rogers v. United States</u>, 696 F. Supp. 2d 472, 488 (W.D. Pa. 2010) (citing <u>Rode</u>

7

v. Dellarciprete, 845 F.2d 1195, 1208 (3d Cir. 1988)) ("If a grievance official's only involvement is investigating and/or ruling on an inmate's grievance after the incident giving rise to the grievance has already occurred, there is no personal involvement on the part of that official."). Having determined that Holly lacks sufficient personal involvement in Altenbach's medical treatment claim, we conclude that the District Court properly declined to exercise supplemental jurisdiction over Altenbach's state law claim against her.

In granting the Medical Defendants' motion for summary judgment, the District Court accurately observed that Altenbach received substantial medical treatment for his shoulder injury at both correctional facilities and accurately characterized his claim as "nothing more than his subjective disagreement with that medical care."

Regarding the adequacy of the treatment, Altenbach received a number of continuous and responsive medical interventions for more than a year including pain medications, steroid injections, x-rays, an MRI, physical therapy, and ultimately an Electromyogram, which revealed a nerve injury. These responses were predicated on the reasonable professional opinions of the Defendants, seemingly confirmed by the MRI results, that Altenbach's injury was only muscular in nature. To the extent Altenbach claims that this particular course of treatment was ineffective, this amounts to "[m]ere disagreement as to the proper course of medical treatment," which is insufficient to state an Eighth Amendment claim. Spruill v. Gillis, 372 F.3d 218, 235 (3d Cir. 2004) (citing Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326, 346 (3d

Cir.1987)); See also Norris v. Frame, 585 F.2d 1183, 1186 (3d Cir. 1978) ("Where the plaintiff has received some care, inadequacy or impropriety of the care that was given will not support an Eighth Amendment claim.").

Concerning the timeliness of the interventions, the gist of Altenbach's claim is that if his nerve injury had been detected earlier along, his treatment plan, and prognosis, might have been different.  Altenbach acknowledges, however, that the purported nerve injury revealed by the Electromyogram was "uncommon," so the failure of the Defendants to recognize the possibility of such an injury, and order an Electromyogram study to diagnose it, amounts, at worst, to medical malpractice, which is not actionable under the Eighth Amendment. Kost v. Kozakiewicz, 1 F.3d 176, 185 (3d Cir. 1993) ("[M]edical malpractice does not become a constitutional violation merely because the victim is a prisoner.").

The earliest indication of a nerve injury in the medical records is found in the Electromyogram study report issued on January of 2016.  Even if we credit Altenbach's unsubstantiated allegation that Dancha reported the possibility of a nerve injury in July of 2014 – about four months before he ordered the Electromyogram study – his claim would still fail because he has offered no "verif[ied] medical evidence . . . to establish the detrimental effect of [the] delay," as he must do to support a delayed treatment claim. Hill v. Dekalb Rg'l Youth Detention Ctr., 40 F.3d 1176, 1188 (11th Cir. 1994) (overruled on other grounds).  He has offered, instead, only bare allegations that his prognosis might have been different had the injury been earlier detected. Such speculation, without

9

additional evidentiary support, is insufficient to survive a motion for summary judgment.[3]

See Oates v. Discovery Zone, 116 F.3d 1161, 1165 (7th Cir. 1997) ("[A] non-moving party may not avert summary judgment by baldly contesting his adversary's factual allegations."); First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 290 (1968) (Plaintiff cannot rest on his allegations to get to a jury without "any significant probative evidence tending to support the complaint.").

Regarding the denial of Altenbach's requests to be cuffed only in the front, we find no error in the District Court's determination that he failed to establish a serious medical need in connection with this request. As the District Court accurately observed, several medical notes indicated that he had full range of motion and was exercising and doing pushups at the time of the requests. Having determined that the District Court properly dismissed the Eighth Amendment claim against the Medical Defendants, we conclude that the Court properly declined to exercise jurisdiction over Altenbach's state law claim.

---

[3] In the District Court, Altenbach cited LeMarbe v. Wisneski, 266 F.3d 429, 440 (6th Cir. 2001) for the proposition that a "failure to make timely referral to [a] specialist or tell [a] patient to seek one out" constitutes deliberate indifference. LeMarbe, however, addressed a physician's failure to immediately refer a prisoner to a specialist, following gallbladder surgery, when the physician observed five liters of bile in the prisoner's abdomen. In addition, the plaintiff there submitted an affidavit in opposition to defendant's motion for summary judgment from a physician who swore that "*anyone* with a medical education and [ ] *most lay people* who encountered five liters of bile in a patient's abdomen would have known that the bile in LeMarbe's abdomen was due to a leak and that such condition posed a substantial risk of serious harm to LeMarbe if the leak was not closed or stopped before permanent damage occurred." Id. at 438 (emphasis in original). Altenbach has submitted no similar evidence here to indicate such a pressing need for immediate referral.

Accordingly, we will summarily affirm the decision of the District Court.