**John A. PANSY, Plaintiff,**

**v.**

**Ernest D. PREATE, Jr., et al., Defendants.**

**Civ. No. 92–778.**

United States District Court, M.D. Pennsylvania.

Oct. 6, 1994.

---

James A. Swetz, Cramer, Swetz & McManus, Stroudsburg, PA, for plaintiff.

Gregory R. Neuhauser, Office of the Atty. Gen., Harrisburg, PA, for defendants.

*MEMORANDUM AND ORDER*

CONABOY, District Judge.

This is a civil rights action filed by Plaintiff Pansy on June 8, 1992, for compensatory and punitive damages pursuant to the Civil Rights Act of 1979, 42 U.S.C. § 1983, alleging the Defendants, all of whom are employed by the Office of the Attorney General for the State of Pennsylvania, violated his constitutional rights while they acted under the color of state law during the course of an investigation into alleged theft of coins from parking meters. (Doc. No. 1). Plaintiff is also asserting supplemental jurisdiction pursuant to 28 U.S.C. § 1367, in that he alleges state law claims.

The Complaint was answered by the Defendants on July 15, 1992. The action is currently before the Court on the Defendants' Motion for Summary Judgment. The Defendants filed their Motion on December 6, 1993, and their brief in support was filed on December 20, 1993. The Plaintiff filed a Brief in Opposition to the Defendants' Motion. (Doc. No. 59). The Defendants subsequently filed a reply brief. (Doc. No. 78). The Court heard oral argument from both Plaintiff's and Defendants' counsel on April 25, 1994. The Court notes that both sides have submitted numerous documents in support of their briefs. The action is now ripe for review.

*BACKGROUND*

Plaintiff John A. Pansy is a resident of 849 Phillips Street, Stroudsburg, Pennsylvania. He is currently a member of the Stroudsburg Police Department and during the course of the investigation which eventually led to this suit was the Chief of Police. The Defendants in this matter are Ernest D. Preate, Jr., the Attorney General for the State of Pennsylvania; John Burfete, Deputy Attorney General; Lois Lichtenwalner, Deputy Attorney General; Michael Crossin, Joseph Farkus, Charles Read, Thomas Gallagher and John Purcell, all of whom are investigative agents for the State Attorney General's Office.

This action arose during Plaintiff's tenure as the Chief of the Borough's Police Department. He was investigated and later arrested by agents of the Pennsylvania Attorney General's Office. Plaintiff was charged with offenses relating to the alleged improper handling of parking meter money.

During the summer of 1990 and throughout the remainder of the year and into the spring of 1991, the State Attorney General's Office conducted an investigation into the reported decline of revenue coming from the parking meters in the Borough of Stroudsburg [1]. Following the investigation conducted by Defendants Crossin, Farkus, Read, Gallagher and Purcell, along with testimony taken before the Seventh Statewide Investigating Grand Jury, the Grand Jury on April 11, 1991, issued Presentment No. 25, against Plaintiff for violations of the Pennsylvania Crimes Code; Theft by Failure to Make Required Disposition of Funds Received—18 Pa.Cons.Stat. § 3927 (1973); Theft by Unlawful Taking or Disposition—18 Pa.Cons. Stat. § 3921 (1973); Receiving Stolen Property—18 Pa.Cons.Stat. § 3925 (1973) and Dealing in Proceeds of Unlawful Activities—18 Pa.Cons.Stat. § 5111 (1989).

Hon. G. Thomas Gates, Supervising Judge of the investigating Grand Jury, issued an Order on April 12, 1991, accepting Presentment No. 25 and authorizing the Attorney General's Office to prosecute the Plaintiff as recommended in the presentment. Thereafter, on April 17, 1991, Defendant Crossin filed two criminal complaints and affidavits of probable cause charging Plaintiff with crimes previously indicated.

1. The parking meters were owned and maintained by the Borough of Stroudsburg.

On the same day, Plaintiff Pansy, with his lawyer, surrendered to law enforcement authorities at the Pennsylvania State Police Barracks at Swiftwater, Pennsylvania. Plaintiff was then fingerprinted and photographed by the Defendants and later brought before the District Justice Henry McCool for an arraignment. The Plaintiff was released on his own recognizance and a preliminary hearing was set for April 26, 1991. The preliminary hearing was held on April 26, 1991, lasting approximately seven (7) hours, and at the conclusion, District Justice McCool determined there was sufficient evidence to bind all criminal charges over for trial.

Due to the nature and notoriety of the case, on November 18, 1991, a jury was selected from Adams County, Pennsylvania, pursuant to an order granting Plaintiff's request for change of venue. The jury was transported to Monroe County to sit and hear the trial which commenced on November 19, 1991 and lasted to December 6, 1991. At the conclusion of the trial, Plaintiff Pansy was acquitted on all criminal charges.

Plaintiff commenced this action approximately seven months after the conclusion of the trial.

In Count I, Plaintiff alleges Michael Crossin, Joseph Farkus and John Purcell violated his constitutional rights when they initiated a criminal proceeding against the Plaintiff without probable cause, and following what the Plaintiff claims was an inadequate and unreasonable investigation. Furthermore, Plaintiff claims Defendants Crossin, Farkus and Purcell maliciously prosecuted him without probable cause, charging them with false arrest and abuse of process. (Doc. No. 1).

In Count II, Plaintiff Pansy alleges Defendants Preate, Burfete and Lichtenwalner gave improper legal advice to Defendant Crossin prompting Crossin to file the criminal complaints against the Plaintiff.

In Count III, Plaintiff alleges the common law torts of Assault and Battery, Intentional Infliction of Emotional Distress, False Imprisonment and constitutional violations for false arrest, excessive force and false imprisonment against Defendants Read, Crossin and Farkus. These allegations stem from the evening of December 12, 1990, when Defendants Crossin, Read and Farkus secured a search warrant from Presiding Judge G. Thomas Gates and executed it at Plaintiff Pansy's residence at 849 Phillips Street, Stroudsburg. Plaintiff alleges the Defendants used excessive force when they executed the search warrant at his home, clearly beyond the scope of their duties.

Finally, in Count IV, Plaintiff alleges that Defendants Gallagher and Purcell failed to adequately train and supervise Defendants Crossin, Farkus and Read in such a way that led to the violation of the Plaintiff's constitutional rights.

### *DISCUSSION*

#### *I. LEGAL STANDARD.*

In considering a Motion for Summary Judgment, we must ascertain, on the basis of pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any, whether or not there are any genuine issues of material fact, and if none, whether the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Schleig v. Communications Satellite Corp.*, 698 F.Supp. 1241 (M.D.Pa.1988). An issue of material fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Incorporated,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

The "burden to demonstrate the absence of material fact remains with the moving party regardless of which party would have the burden of persuasions at trial." *Levendos v. Stern Entertainment,* 860 F.2d 1227, 1229 (3rd Cir.1988). The moving party's "burden" under Rule 56(c), however, is discharged by demonstrating to the Court the absence of evidence to support the non-moving party's case. *Trap Rock Industries, Inc. v. Local 825, International Union of Operating Engineers, AFL–CIO,* 982 F.2d 884, 890–91 (3rd Cir.1992).

In defending against a Motion for Summary Judgment, the non-moving party may not "rest upon mere allegations, general

denials, or ... vague statements ..." *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3rd Cir.1991). If the non-moving party's evidence "is merely colorable, ... or is not significantly probative, ... summary judgment may be granted." *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3rd Cir. 1992) (quoting *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2510). Thus, "while the facts must be viewed in the light most favorable to the nonmoving party and all inferences must be drawn in that party's favor ... there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party". *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3rd Cir.1992).

*A. Defendants Crossin, Farkus and Purcell.*

*1. Malicious Prosecutions.*

Plaintiff asserts the Defendants maliciously prosecuted him without probable cause, when, in an abuse of the process, they falsely arrested him and continued the proceeding.

Pennsylvania law requires that in a malicious prosecution claim, a Plaintiff must prove the Defendants (1) instituted the proceedings (2) without probable cause and (3) with actual malice and (4) that the proceedings terminated in favor of the Plaintiff. *See Griffiths v. CIGNA Corp.*, 988 F.2d 457 (3rd Cir.1993) (citing *Kelley v. General Teamsters, Local Union 249*, 518 Pa. 517, 544 A.2d 940, 941 (1988)); *See also Valenti v. Sheeler*, 765 F.Supp. 227 (E.D.Pa.1991). If any of these elements cannot be proven the malicious prosecution claim cannot prevail.

The Defendants do not dispute the fact the criminal proceedings terminated in Plaintiff Pansy's favor. They clearly and rather tenaciously dispute the remaining elements. Specifically, they refute the malice element. Malice includes ill-will in the sense of spite, the use of a prosecution for an extraneous, improper purpose, or the reckless and oppressive disregard of the Plaintiff's rights. *Lee v. Mihalich*, 847 F.2d 66, 70 (3rd Cir.1988). Malice can be inferred from the absence of probable cause. *Kelley v. General Teamsters, Local Union 249*, 518 Pa. 517, 544 A.2d 940 (1988).

The gravamen of the Plaintiff's federal claims against the Defendants is that he was arrested and prosecuted without probable cause. For an arrest to be constitutionally valid, it must be made with probable cause. *Valenti v. Sheeler*, 765 F.Supp. 227 (E.D.1991). Although probable cause requires more than mere suspicion, it does not require that the evidence at the time of the arrest be sufficient to prove guilt beyond a reasonable doubt. *Warlick v. Cross*, 969 F.2d 303, 306 (7th Cir.1992); *United States v. Glasser*, 750 F.2d 1197, 1205 (3rd Cir.1984) (quoting *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964)). Rather, probable cause exists if at the moment of the arrest, the facts and circumstances within the knowledge of the police officers were sufficient to warrant a prudent person to believe that the Plaintiff had committed or was committing an offense, *Hunter v. Bryant*, 502 U.S. 224, 228–29, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991). In *Illinois v. Gates*, 463 U.S. 1237, 104 S.Ct. 33, 77 L.Ed.2d 1453 (1983), the United States Supreme Court adopted a "totality of the circumstances" approach to evaluating whether or not probable cause exists for the issuance of a search warrant. *Id.* at 230–41. The determination by a police officer that probable cause exists for a warrantless arrest is fundamentally a factual analysis that must be performed by the officer at the scene. Thus, the Court stated, probable cause is a "fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Id.* at 232.

The ultimate finding of guilt or innocence, or even dismissal of charges arising out of an arrest and detention has no bearing on whether the arrest was valid. *Pierson v. Ray*, 386 U.S. 547, 555, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967). Otherwise, every time charges filed against an arrestee were dismissed or dropped, the police officers involved would be liable for false arrest or violations of the arrestee's civil rights. *Id.* The conduct alleged to constitute a deprivation of constitutional rights must have been

unreasonable under the circumstances and facts known by the police officer at the time the conduct occurred.

Where there is no genuine issue as to any material fact and where credibility conflicts are absent, the issue of probable cause may be resolved by summary judgment. *Deary v. Three Un-Named Police Officers,* 746 F.2d 185, 192 (3rd Cir.1984). When it is appropriate to determine the issue of probable cause by summary judgment, it is the function of the Court to determine whether the objective facts available to the officers at the time of the arrest were sufficient to justify a reasonable belief that an offense was committed or was being committed. *United States v. Glasser,* 750 F.2d 1197, 1206 (3rd Cir.1984).

A review of the record shows that Borough Manager Carl Rogers, reported a substantial loss of revenue from parking meters for the years 1987 to 1989 when the revenue fell from $163,959 to $108,424. Thereafter, at the Borough's request, the agents from the Office of the Attorney General began an investigation into the loss of the revenue. On June 13, 1990, Defendant Crossin interviewed Borough Manager Carl Rogers, who was familiar with the operation of the Borough of Stroudsburg. Mr. Rogers advised Defendant Crossin that certain irregularities existed regarding the collection within the Borough of Stroudsburg, and that revenue from the parking meters had decreased approximately $50,000.00 between the years of 1988 and 1989.

Rogers also advised Defendant Crossin during the period that the Stroudsburg Borough Police Department was given the added responsibility of counting the coins collected from the borough's parking meters. It was also learned during the course of the statements taken that Plaintiff Pansy personally supervised the collection of parking meter money. Based on this information, Defendant Crossin, on Wednesday, August 1, 1990, conducted surveillance of the area where money was collected from the parking meters. Plaintiff was seen placing the parking meter collection in the trunk of his black Ford Taurus and parking the Taurus in the garage located beneath his residence. Later that day, after a second collection, Plaintiff again met with the meter maids to remove the meter money. Plaintiff Pansy's car was also again seen on the block where his residence is located.

Thereafter, Defendant Crossin and other agents from the office of the Attorney General decided to place marked coins in certain parking meters that were collected by the meter maids and later turned over to the Plaintiff. Defendant Crossin marked 800 quarters with an invisible fluorescent marking fluid which showed a brilliant blue when exposed to a long wave of ultra violet light. On Monday evening, August 13, 1990, and Tuesday morning, August 14, 1990, Defendant Crossin placed these quarters in parking meters at specified locations within the Borough of Stroudsburg. On August 16, 1990, Plaintiff Pansy collected the coins from the meter maids and drove his car to his home where he parked inside his garage. The Defendants made arrangements with officials at the First Eastern Bank to scan the deposits from the meter collection. Since all the parking meters in which marked coins were placed had not been collected, 200 marked coins remained in meters located on the north and south side of Monroe Street. Of the remaining 600 marked coins, a total of 362 specifically marked quarters were found within the collection. A total of 238 marked coins remained unaccounted for.

The Defendants repeated this process again on Monday, August 20, 1990 and Tuesday, August 21, 1990, when 700 newly marked quarters were placed into specific locations. On Wednesday, August 22, 1990, Plaintiff Pansy was seen collecting the meter money and was driving toward his home when he saw an agent from the Attorney General's office parked in the area. Plaintiff Pansy did not park in his driveway or in front of his home.[2] On August 28, 1990, Defendant Crossin met with officials from

2. Plaintiff Pansy and another Stroudsburg Police Officer, Ken Nevil, approached the agent who informed them he was in the area conducting a PennDot investigation of a paving crew working in the area.

the First Eastern Bank to scan the deposit of quarters. Defendant Crossin discovered of the total 900 marked quarters which should have been present in the deposit, 897 marked quarters were returned. Thereafter, Defendant Crossin inserted 200 newly marked quarters into parking meters in two collections zones on Thursday and Friday, August 30 and 31, 1990.

Defendants scanned the collections on Thursday, September 6 and Wednesday, September 12, 1990, when Agent Crossin recovered 94 marked quarters and 78 quarters from two different locations. He discovered a total of 28 marked quarters were missing. Furthermore, one of the three marked quarters from the August 22, 1990 collection was found in a collection bag.

Sometime later, Defendant Crossin discovered that Plaintiff Pansy became aware the coins in the meter collection were marked with ultra violet fluid.[3] The Defendants then devised a new system for marking the coins, where they scribed the quarters with a particular lettering on each one so that they could determine that it was part of the number of quarters deposited in the meters. On October 12, 1990, 400 scribed quarters were placed into the parking meters in four different zones. On Thursday, October 18, 1990, 178 marked quarters were found from a total of 235 scribed coins placed in meters. There were fifty-seven (57) marked quarters missing. On October 25, 1990, the Defendants scanned the collection of October 24, 1990. At this time, there were only 102 marked coins found, and sixty-three marked quarters remained missing. Defendant Crossin continued to monitor the meter deposits at the local banks where the meter collections were deposited, and apparently, no marked quarters were recovered.

Defendant Crossin and other agents from the Attorney General's Office continued to watch the Plaintiff. On November 28 and Wednesday, December 5, 1990, Plaintiff Pansy was seen meeting with the meter maids to pick-up the meter collection, and then drive to his home, where he drove his car into the garage located beneath his residence.

The Defendants placed 640 specially scribed quarters into parking meters located in certain zones in the Borough on December 6, 7 and 10, 1990. On December 12, 1990, Plaintiff Pansy was observed returning to his residence, after picking up a coin collection from the meter maids. The meter collection was examined by the Defendants and it was learned that marked coins were missing.

The Defendants secured a search warrant that night from Presiding Judge G. Thomas Gates, which was executed on December 12, 1990, at Plaintiff Pansy's residence located at 849 Phillips Street.[4]

As a result of the search of Plaintiff's home, the Defendants located a blue cooler on the floor of Plaintiff's bedroom closet, containing $309.64 in change and an index card marked "12/12/90, check money". Of the many quarters found within the cooler, 76 were marked. Another item, a brown briefcase bag containing $309.35 in change and an index card marked "4 October 90 meter collection, check for marked money per Mayor Gross", was found. A five gallon water jug containing $523.24 in change was also found, as well as coins from Plaintiff's ashtray, vehicle, and several bags, totalling $55.56. Altogether, approximately, $1,197.79 in coins was found within Plaintiff's home.

Later that day, Defendant Crossin spoke with Mayor Gross at the Borough building about the presence of marked coins recovered by the Defendants at the Plaintiff's

3. A parking meter collection maid, Nancy Gordon, testified before the Grand Jury that sometime in August or September, 1990, she testified while she was collecting money from the meters one day she noticed some coins with what she called an odd tint to them. Gordon later told Plaintiff Pansy, who requested her to remove a few of the coins from the collection. Gordon removed three quarters from the collection and showed them to him. She said Pansy later examined their hands under a black light. Furthermore, Pansy also asked them to "to keep an eye out" for Carl Rogers and another borough employee named Carol Nauman.

4. The Court notes that Defendant Purcell submitted an extensive twenty-two page affidavit of probable cause in support of the search warrant, providing Judge Gates with much detail of the movements of the Plaintiff before, during and after the collection of the parking meter money. (Doc. No. 55a–77a).

home. It was at this time Mayor Gross told Crossin that Pansy informed him he had discovered marked coins in the meter collection and told the Mayor he believed they were being "set up". Mayor Gross stated that Plaintiff Pansy had informed him of the appearance of marked coins in the collection but could not recall when the conversation occurred. The Mayor also said the Plaintiff advised him he would check the next meter collection to determine if any more coins were found. The Mayor told Defendant Crossin that Pansy reported additional marked coins were located in the meters.

On the evening Mayor Gross spoke with Crossin, Mayor Gross gave Crossin permission to search the evidence vault where Pansy told the mayor he kept the coins. Defendants found several paper bags marked "no parking" containing coins. Inside the bags a number of coins were located and examined by the Defendants. One of the coins inside the bags was marked with fluorescent fluid.

Thereafter, on December 21, 1990, Plaintiff Pansy gave a sworn statement to his attorney, which was later introduced into evidence before the Grand Jury. (Doc. No. 60). Plaintiff Pansy stated the reason for the loss of meter revenue was the sewer construction project which occurred from October 1988 through the early spring of 1989. Plaintiff Pansy also said since he found marked coins in the meters he conducted his own investigation into the meters. As was earlier stated, Plaintiff said he received permission from the Mayor to hold some of the marked coins in the evidence vault in order to maintain evidence of what he found and to confront possible accusers with it. Furthermore, Plaintiff Pansy said he received permission to take the collection bags to his home and remove some marked coins, which accounted for the change in collection procedures. Plaintiff Pansy also alleged the security system maintained by the borough was lax and the meter collections were often dropped off in canvas bags at the entry to First Eastern Bank and left unaccounted for.

The Grand Jury in subsequent months heard testimony from numerous witnesses who were present or former employees of the borough. Their testimony refuted the Plaintiff's allegations in his statement.

Borough manager Carl Rogers testified although some sections of the sewer construction project included streets with parking meters, most of the work occurred on unmetered streets. Rogers stated the largest source of meter revenue, Main Street, involved only one block of the construction project for a period of one week.

Furthermore, Kathy Tallada testified she was the Plaintiff's secretary for five years. When she began her duties, the meter maids would pick up the meter bags and take them directly to the bank. In 1988, the procedure changed, when the maids were told to bring the coins directly to Plaintiff Pansy's office, wherein, he would count the money personally, before the money was taken to a bank by an on-duty officer. In August 1989, the duty of counting the money was apparently delegated to Ms. Tallada when a coin counter was placed in her office. However, according to her testimony, the meter bags were still brought into Pansy's office on a Friday and remained there until Monday morning.[5]

The coin counter was removed in May, 1990, however, not without the opposition of Chief Pansy. During that time, the borough council, on June 13, 1990, passed a resolution directing meter money to be collected on a specific day and deposited directly to the bank. However, Plaintiff Pansy failed to follow the resolution and chose the day the meter money was to be collected. Pansy had reportedly worked out a system to pick up the money from the meter maids and take it to his home.

Ms. Tallada further testified that the money taken to the bank was never left on the loading dock. She said it was always taken to a vault and secured in a locked coin counting room. Ms. Tallada testified that Plaintiff Pansy never informed her he was conducting an investigation into the marked coins and he never asked her to prepare any reports re-

5. On one occasion Ms. Tallada testified the money from a specified location, parking lot 2, was brought directly to her office. She testified when the money was counted the tally was noticeably higher than any previous week's total.

garding the coin investigation. Further, she stated that when she was served with the grand jury subpoena, that Plaintiff Pansy asked her to be vague and to "please keep him out of jail".

Defendant Pansy gave a sworn statement to his attorney which was later forwarded to the grand jury. Pansy's statement was later introduced into evidence before the grand jury. Pansy claimed whatever security existed for the keys to the meters was lax and that meter collections were often dropped off in canvas bags at the rear to the First Eastern Bank and consequently left unattended. However, witnesses testifying before the grand jury, such as meter maids and Mark Louchart, a borough employee in charge of fixing the meters, contradicted Pansy's allegations. The meter maids confirmed meter keys were stored within the police department when not in use, and were not lost or misplaced. Meters that were broken were removed, and brought to the boiler room for repair. A working meter was used to replace the broken one.

Finally, Mayor Gross testified he gave Plaintiff full authority to run the police department as he saw fit and make any changes in the collection of meters. The Mayor denied Plaintiff's statements that he was operating under the Mayor's orders when he took the marked money to his home for investigation, and further, the Mayor testified he never saw any reports regarding an investigation Plaintiff was conducting of marked coins. Gross was so surprised and upset when marked money was found in Pansy's home he testified "I figured there shouldn't be any money there."

During the night of the search of Pansy's home, after the agents left, Pansy met Gross at the borough building and showed him an envelope which he said was marked coins. But Gross never looked inside the envelope. On February 5, 1991, Defendant Crossin, with the borough's permission, received a manila envelope from the evidence room marked coin from S–1 investigation into marked money. The envelope contained four film canisters containing coins. The first canister contained four quarters, only one of which was marked. This coin appeared to be from the coins deposited on August 29 and 30, 1990. Canister No. 2 contained seven quarters, six of which were marked in the same manner as the coin found in canister no. 1. The seventh quarter was scribed with an "X" on the tail side, indicating that this coin was one of the quarters placed in meters on August 14 and 15, 1990. The third canister contained two quarters, neither of which was marked. The fourth canister contained 21 quarters, all of which were marked identically to those placed in meters on August 29 and 30, 1990.

The Grand Jury also heard testimony of Plaintiff Pansy's friend and social acquaintance, Sandra Lutman, who, over the course of several years, took the coins Plaintiff had given to her to a local bank to be exchanged into paper currency. Karen Yasco, an employee of the bank, testified under oath that Ms. Lutman, between 1987 and early 1988, was coming into the bank at least three times each month, carrying large amounts of coins to exchange for paper currency in large denominations. Each time Ms. Lutman came into the bank, Ms. Yasco said she would have a minimum of $500.00 in quarters.[6]

This Court concludes the Defendants had compiled more than enough information that would lead any reasonably prudent person to believe that Plaintiff Pansy violated numerous sections of the Pennsylvania Crimes Code for which he was charged.

As the Defendants have accurately argued, it is not this Court's place to find whether or not Plaintiff Pansy was guilty beyond a reasonable doubt. The only material question is whether there was *probable cause* at the time of the arrest. Here, the Court finds there was a number of factors present for the Defendants to constitute probable cause. First, there was the many hours of surveillance by the Defendants of Plaintiff Pansy's movements as he collected the meter bags

6. Investigators determined from Ms. Lutman and Yasco's testimony, that assuming Ms. Lutman made bi-monthly trips to the bank and exchanged approximately $500.00 in currency each time, that for the period January 1, 1989, through December, 1990, Ms. Lutman would have exchanged a total of $23,000.00 in coins for Pansy.

from the meter maids, took the bags to his home, and then later to headquarters. This procedure was carried out sometime before Pansy became aware that the meter money was marked.

Next, the Defendants also utilized the testimony of numerous grand jury witnesses to discredit Plaintiff Pansy's statement, particularly his claim that Defendant Crossin failed to adequately investigate how much impact the sewer construction project had on the drop in revenue. Finally, Defendants gathered information from other borough employees, such as Mayor Gross, meter maids and a repairman that further contradicted Pansy's claim of lax security of meter equipment resulting in the need to take the coins from the meter collection to his home.

This issue is not as the Plaintiff argues. We find the facts within the record and the inferences drawn therefrom are obvious enough to constitute probable cause. In view of Pansy's observed movements, the grand jury testimony of the numerous witnesses, especially that of Mayor Gross, Ms. Tallada and bank employees, and armed with the knowledge that Defendant Crossin and other Defendants had concerning Pansy's activity, one could rationally determine these alleged crimes took place and that Plaintiff Pansy could have committed them. *See U.S. v. Cruz,* 910 F.2d 1072 (3rd Cir.1990). *Sibron v. New York,* 392 U.S. 40, 88 S.Ct. 1912, 20 L.Ed.2d 917 (1968).

Furthermore, a review of Plaintiff's claim in Count I appears to be a limited one. A fair reading reveals Plaintiff based his claim upon the substantive due process clause of the Fourteenth Amendment to be free of prosecution without probable cause. In *Albright v. Oliver,* — U.S. —, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994), the United States Supreme Court decided that there is no substantive right under the Due Process Clause of the Fourteenth Amendment to be free from criminal prosecutions except on probable cause. Accordingly, only the Fourth Amendment's prohibition against the issuance of warrants without probable cause provides a constitutional source for a Section 1983 action such as one pled by Plaintiff in Count I. However, a fair reading of the complaint clearly shows the Plaintiff does not plead a violation of Fourth Amendment rights.[7] The only basis cited by Pansy for his malicious prosecution claim is the Fourteenth Amendment, a basis eliminated by the Supreme Court's holding in *Albright, supra.* Therefore, Plaintiff has no viable constitutional claim for malicious prosecution and Defendants are entitled to judgment as a matter of law in Count I.

Plaintiff also argues the Defendants did not put forth all the information they had pertaining to the Plaintiff's innocence during the Grand Jury proceedings. There is no requirement that prosecutors present allegedly exculpatory evidence to the grand jury. In *United States v. Williams,* 504 U.S. 36, —, 112 S.Ct. 1735, 1745, 118 L.Ed.2d 352 (1992), the United States Supreme Court stated:

> Imposing upon the prosecutor a legal obligation to present exculpatory evidence in his possession would be incompatible with this system. If a 'balanced' assessment of the entire matter is the objective, surely the first thing to be done—rather than requiring the prosecutor to say what he knows in defense of the target of the investigation—is to entitle the target to tender his own defense. To require the former while denying (as we do) the latter would be quite absurd. It would also be quite pointless, since it would circumnavigate the system by delivering his exculpatory evidence to the prosecutor, whereupon it would *have* to be passed to the grand jury—unless the prosecutor is willing to take the chance a court will not deem the

7. In paragraph 50 incorporated in Count I, Plaintiff's complaint reads as follows.

> Defendant Michael Crossin, aided by Defendants Farkus, Purcell and other agents:
> (a) Initiated a criminal proceeding against Plaintiff; and
> (b) Which ended in Plaintiff's favor; and
> (c) Which was initiated without probable cause and following an inadequate and unreasonable investigation as aforesaid; and
> (d) Was pursued maliciously with callous and reckless disregard of John Pansy's constitutional rights to be free from malicious and prosecutions without probable cause, false arrest and abuse of process.

evidence important enough to qualify for mandatory disclosure. *See United States v. Law Firm of Zimmerman & Schwartz P.C.,* 738 F.Supp. 407, 411 (Colo.1990).

*Id.,* 504 U.S. at ——, 112 S.Ct. at 1745.

The Grand Jury and the district justice made an informed judgment after hearing the evidence in the case. The decision of the district justice on April 26, 1991, which established a *prima facie* case against the Plaintiff, only adds support to the Defendants' argument there was indeed probable cause to the case. In short, case law is clear, there is no requirement that guilt beyond a reasonable doubt be proven at the charging stage or that allegedly exculpatory evidence be presented to the grand jury. Indeed, it is the general rule in the federal jurisdiction that the prosecutor has no obligation to present exculpatory evidence to the grand jury. *See U.S. v. NYNEX Corp.,* 781 F.Supp. 19 (D.D.C.1991); *United States v. Poindexter,* 725 F.Supp. 13, 39 (D.D.C.1989). Accordingly, we find the Defendants had gathered more than enough information to establish probable cause for the Plaintiff's arrest and there is no evidence of malice or ill will on the Defendants' part that rises to the level of malicious prosecution.[8]

*2. Abuse of Process.*

The elements of the common law tort of malicious use of civil process under Pennsylvania law are:

(1) He acted in a grossly negligent manner or without probable cause and primarily for a purpose other than that of securing the proper discovery, joinder of parties or adjudication of the claim in which the proceedings are based; and

(2) The proceedings have terminated in favor of the person against whom they are brought.

*See McArdle v. Tronetti,* 961 F.2d 1083, 1088 (3rd Cir.1992) (citing 42 Pa. Const.Stat.Ann.). In the recent decision by the United States Supreme Court in *Albright v. Oliver,* —— U.S. ——, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994), it was stated a claimed constitutional violation must be grounded in a specific constitutional provision—i.e. the Fourth Amendment—rather than the generalized notion of due process. The Supreme Court also stated the Constitution does not impose a standard for the initiation of a prosecution, but since the Due Process Clause protects against having to stand trial on a malicious charge, a state actor's unauthorized deprivation of that interest cannot be challenged under § 1983 if an adequate remedy is provided. *Id.*

Here, Plaintiff had the opportunity to challenge the sufficiency of the grand jury indictment against him. Plaintiff could have tested the sufficiency of the presentment and supporting testimony at the preliminary hearing. He could have filed a pretrial motion challenging the sufficiency of the charges, and furthermore he could have filed motions to suppress the evidence against him at the pretrial stages of the proceedings.

Even if this Court were to construe a due process claim against the Defendants, there appears to be no merit to the Plaintiff's allegation in his complaint that he "was pursued with the intention of removing John A. Pansy as Chairman of the Monroe County Drug Task Force and as Chief of Police of the Borough of Stroudsburg". The record before the Court shows Plaintiff was not removed from the Monroe County Drug Task force by the Attorney General's Office. Instead, Plaintiff was removed by his fellow Chiefs of Police without any undue influence from the State. (Doc. No. 77, Deposition testimony of Anthony Fluegel, Chief of Police of Coolbaugh Township, pages 4–8, 17–20 and 28–36; and Joseph C. Peters, Executive Deputy Attorney General, pages 4, 9–12, 17–19, 22–23 and 29). Plaintiff has not presented any evidence that disputes this. Plaintiff's bald allegation, that there was an improper motive to arrest him for unlawfully removing coins from meters, finds no support in either documents or testimony.

Federal Rule 56(e) states that "an adverse party may not rest upon mere allegations or denials of the adverse party's pleading but

8. The Plaintiff's claim that the Defendants' press conference at the State Police Barracks was evidence of ill will must also fail. *See Buckley v. Fitzsimmons,* —— U.S. ——, ——, 113 S.Ct. 2606, 2615, 125 L.Ed.2d 209 (1993).

the adverse party's response, by affidavits or as otherwise provided by this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment will, if appropriate, be entered against the adverse party." *See Celotex Corporation v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1984). The Third Circuit has made it clear that a non-moving party resisting a Motion for Summary Judgment "cannot expect to rely merely upon bare assertions, conclusory allegations or assumptions." *Ness v. Marshall,* 660 F.2d 517, 519 (3rd Cir.1981).

Accordingly, we find the Plaintiff's claims for malicious prosecution, abuse of process, false arrest and false imprisonment should be dismissed.

*3. Qualified Immunity.*

The Defendants argue they are entitled to qualified immunity in response to the Plaintiff's claims. Government officials carrying out discretionary functions generally are shielded from liability for civil damages if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *See Shea v. Smith,* 966 F.2d 127 (3rd Cir.1992). *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Malley v. Briggs,* 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); *Anderson v. Creighton, Jr.,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). These cases discuss the need to balance the immunity which officials, such as prosecutors and police, need to allow them to carry out their duties without the fear of constantly defending themselves against insubstantial claims for damages and the important interests of the members of the public to recover damages for the unreasonable invasions or violations of their rights under the Laws and Constitution of the United States.

In *Harlow,* supra, the Supreme Court held that Government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. See *Procunier v. Navarette,* 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978); and *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1974).

In *Malley,* the Supreme Court was faced with a question of the degree of immunity to be accorded a defendant police officer in a damage action under 42 U.S.C. § 1983, when it was alleged that the officer caused the Plaintiffs to be unconstitutionally arrested by presenting a judge with a complaint and a supporting affidavit which failed to establish probable cause.

The Court there held that the same standards of objective reasonableness that was applied in the context of a suppression hearing in *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) defines the qualified immunity accorded an officer whose request for a warrant allegedly caused an unconstitutional arrest. The Court held that only where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable, will the shield of immunity be lost. The court in *Malley* said that the question in that case was whether a reasonably well trained officer would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant under the conditions existing in that case.

The court in *Malley,* in commenting on what it referred to as the "*Harlow* standard," stated as follows:

> We do not believe that the *Harlow* standard, which gives ample room for mistaken judgments, will frequently deter an officer from submitting an affidavit when probable cause to make an arrest is present. True, an officer who knows that objectively unreasonable decisions will be actionable may be motivated to reflect, before submitting a request for a warrant, upon whether he has a reasonable basis for believing that his affidavit establishes probable cause. But such reflection is desirable, because it reduces the likelihood that the officer's request for a warrant will be premature. Premature requests for warrants are at best a waste of judicial resources; at

> worst, they lead to premature arrests, which may injure the innocent or, by giving the basis for a suppression motion, benefit the guilty.

See *Malley,* supra, 475 U.S. at page 343, 106 S.Ct. at page 1097.

*Anderson* was a case against an FBI agent seeking damages resulting from the warrantless search of a resident's home. The agent, Anderson, filed a motion for dismissal or for summary judgment and before any discovery took place, the district court granted summary judgment on the ground that the search was lawful and that the undisputed facts revealed that Anderson had probable cause to search the resident's home and that his failure to obtain a warrant was justified by the presence of exigent circumstances.

On appeal to the 8th Circuit the matter was reversed and on further appeal to the Supreme Court, that court in turn, vacated the judgment of the court of appeals and remanded the case to the district court for further proceedings consistent with its opinion. The Supreme Court in effect held that summary judgment should not have been granted absent the discovery of additional facts bearing on the issue of all of the circumstances that existed at the time the decision to make the search was made. The Supreme Court commented as follows in remanding the case:

> The Court of Appeals specifically refused to consider the argument that it was not clearly established that the circumstances with which Anderson was confronted did not constitute probable cause and exigent circumstances.... It simply does not follow immediately from the conclusion that it was firmly established that warrantless searches not supported by probable cause and exigent circumstances violate the 4th Amendment that Anderson's search was objectively legally unreasonable. We have recognized that it is inevitable that law enforcement officials will in some cases, reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable.... The same is true of their conclusions regarding exigent circumstances.
>
> The relevant question in this case, for example, is the objective (albeit fact-specific) question whether a reasonable officer could have believed Anderson's warrantless search *to be lawful, in light of clearly* established law *and* the information the searching officers possessed. Anderson's subjective beliefs about the search are irrelevant.
>
> The principles of qualified immunity that we reaffirm today require that Anderson be permitted to argue that he is entitled to summary judgment on the ground that, in light of the clearly established principles governing warrantless searches, he could, as a matter of law, reasonably have believed that the search of the Creightons' home was lawful.

483 U.S. at 640–641, 107 S.Ct. at 3039–3040. (citations omitted) (emphasis added)

The foundation upon which these legal principles rest is not difficult to understand, i.e. protecting an official's right and obligation to act without constant fear of being sued as balanced against a citizen's right to recover damages in the event of an unreasonable violation of that citizen's constitutional rights.

The present case law establishes that qualified immunity shields all Defendants. The Defendants, particularly Crossin, Farkus and Purcell are entitled to qualified immunity if they believed that probable cause existed "at the *moment the arrest* was made ... the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing" that the Plaintiff violated the numerous sections of the Pennsylvania Crimes Code for which he was eventually charged. *See Hunter v. Bryant,* 502 U.S. 224, ——, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991).

Here, the Defendants supported their affidavit with extensive documentation from surveillance and testimony from eyewitnesses showing the presence of probable cause. Furthermore, numerous state judicial officers were requested to examine and deter-

mine the presence of probable cause and likewise found enough favorable evidence to move the case forward: the grand jury, presiding judge, the district justice who issued the arrest warrant, the district justice who presided over the preliminary hearing which lasted over five hours, and the trial judge who allowed the Plaintiff's case to go to a grand jury.

We find the investigating officers did not act unreasonably, but rather, within reason as they carried out their investigation in painstaking detail and examination, probing *all* areas necessary in order to adequately complete it.

The qualified immunity standard "gives ample room for mistaken judgments" by protecting "all but the plainly incompetent or those who knowingly violated the law." *Malley, supra,* 475 U.S. at 343, 341, 106 S.Ct. at 1097, 1096. Moreover, law enforcement authorities are permitted to draw reasonable inferences based on their knowledge and experience, *United States v. Ortiz,* 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975), and such conclusions should not be defeated by hypertechnical readings of affidavits by judges or magistrates. *United States v. Filiberto,* 712 F.Supp. 482, 485 (E.D.Pa.1989). All of the investigators were experienced in investigating this type of criminal activity and the record shows their investigation was comprehensive in structure and necessary since the target of the investigation was the Chief of Police of the Borough of Stroudsburg. Furthermore, the Defendants had received the approval of their superiors in the Attorney General's Office before they officially decided to seek approval from the Grand Jury. Defendants had sought out expert legal opinion before acting. *Bratton v. Toboz,* 764 F.Supp. 965 (M.D.Pa.1991); *See also Los Angeles Police Protective League v. Gates,* 907 F.2d 879, 888 (9th Cir.1990); *Lee v. Mihalich,* 847 F.2d 66 (3rd Cir.1988).[9] *Longo v. Kish,* No. 92–0609 (M.D.Pa. June, 1993).

*4. State Law Claims.*

█ Plaintiff also asserts state law claims for assault and battery, intentional infliction of emotional distress, false imprisonment and constitutional actions for false arrest, excessive force and false imprisonment.

The Pennsylvania General Assembly passed a statute that permits but a few narrow exceptions to the rule of immunity. The statute reads in part:

> "Pursuant to section 11 of Article I of the Constitution of Pennsylvania, it is hereby declared to be the intent of the General Assembly that the Commonwealth, and its officials and employees acting within the scope of their duties, shall continue to enjoy sovereign and official immunity and remain immune from suit except as the General Assembly shall specifically waive the immunity. When the General Assembly specifically waives sovereign immunity, a claim against the commonwealth and its officials and employees shall be brought only in such a manner and in such courts and in cases as directed by the provisions of Title 42 ... unless authorized by statute."

1 Pa.Cons.Stat.Ann. § 2310 (Purdon's Supp. 1990). *See Adams v. McAllister,* 798 F.Supp. 242 (M.D.Pa.1992). All officials and employees of the state acting within the official duties are immune from liability with the exception of the certain prescribed circumstances. *Id.* The General Assembly has provided, in a separate section, nine exceptions to the general grant of immunity. The exceptions are (1) operation of a motor vehicle; (2) health care employees; (3) care, custody or control of personal property; (4) Commonwealth real estate, highways, sidewalks; (5) dangerous conditions; (6) care, custody or control of animals; (7) liquor store sales; (8) National Guard activities; and (9) toxoids and vaccines. 42 Pa.Stat. Ann. § 8522 (Purdon's 1982).

Under Pennsylvania law, however, governmental and sovereign immunity waivers which are exceptions to the rule of immunity are to be strictly construed. *Majestic by Majestic v. Commonwealth Dep't of Transp.* 144 Pa.Cmwlth. 109, 601 A.2d 386 (1991).

9. In *Lee,* the Court held that seeking a legal opinion from an attorney constitutes "information otherwise available" in an assessment of the objective legal reasonableness of official actions.

Defendants Crossin, Farkus and Purcell enjoy immunity provided by 1 Pa.Cons.Stat. Ann. § 2310 in the present actions. A review of the record before the Court clearly shows, no matter how tenaciously the Plaintiff argues, all Defendants were acting within the official capacity as investigators for the state Attorney General's Office. *See Collins v. Bopson,* 816 F.Supp. 335, 341 (E.D.Pa. 1993); *Shoop v. Dauphin County,* 766 F.Supp. 1327, 1334 (M.D.Pa.1991); *Mitchell v. Finnegan, et al.,* No. 92–1147 (M.D.Pa., Nov. 4, 1993); *Longo, et al. v. Kish,* No. 92–609 (M.D.Pa. June 28, 1993); *La Frankie v. Miklich,* 152 Pa.Cmwlth. 163, 618 A.2d 1145, 1149 (1992) (malicious prosecution and abuse of process); *Faust v. Comm. Dept. of Revenue,* 140 Pa.Cmwlth.Ct. 389, 592 A.2d 835 (1991). Furthermore, none of the Plaintiff's state law claims are within the strictly construed exceptions provided for in 42 Pa.Cons. Stat.Ann. § 8522(b). Accordingly, the Plaintiff's state law claims against Defendants Crossin, Farkus and Purcell in Count III will be dismissed.

*B. Defendants Burfete and Lichtenwalner.*

*1. Absolute Immunity.*

Plaintiff alleges Defendants Burfete and Lichtenwalner violated his constitutional rights by providing improper legal advice to Defendants Crossin and other investigators causing false arrest, malicious prosecution and abuse of process. Defendants Burfete and Lichtenwalner contend they were acting within a judicial capacity and therefore are absolutely immune from prosecution.

Every person acting under color of state law is subjected to liability under 42 U.S.C. § 1983 for the deprivation of any other person's rights, privileges or immunities secured by the United States Constitution. However, this statute does not abolish common law immunities. *Tenney v. Brandhove,* 341 U.S. 367, 376, 71 S.Ct. 783, 788, 95 L.Ed. 1019 (1951) (Congress did not intend § 1983 to abrogate immunities well grounded in history and reason); *Buckley v. Fitzsimmons,* — U.S. —, — – —, 113 S.Ct. 2606, 2612–13, 125 L.Ed.2d 209 (1993).

Recognizing the need for government officials to be able to make impartial or imaginative decisions without the threat of personal liability for actions that were taken pursuant to their officials duties, the United States Supreme Court extended the doctrine of absolute immunity to certain government officials under limited circumstances. *See Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) (agency attorney); *Stump v. Sparkman,* 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978) (judge); *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) (prosecutors); *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (absolute immunity extended to Attorney General from suit for damages arising of allegedly unconstitutional conduct in performing national security functions).

It is well established that prosecutors are entitled to absolute immunity for the initiation and pursuit of a criminal prosecution. *Imbler,* 424 U.S. at 420, 96 S.Ct. at 990. Hence, prosecutors are absolutely immune in civil suits which challenge their decisions (1) to initiate prosecutions or (2) concerning the conduct of the trial and presentation of evidence. *Auriemma v. Montgomery,* 860 F.2d 273, 277 (7th Cir.1988), *cert. denied,* 492 U.S. 906, 109 S.Ct. 3215, 106 L.Ed.2d 565 (1989). This immunity covers quasi-judicial functions such as actions taken in the courtroom as well as decisions regarding obtaining, reviewing, and evaluating evidence. *Id.* at 278.

The Third Circuit Court of Appeals, outlined that in determining whether absolute immunity is available for particular actions, the courts engage in a 'functional' analysis of each alleged activity. *See Harlow v. Fitzgerald,* 457 U.S. 800, 811, 102 S.Ct. 2727, 2734, 73 L.Ed.2d 396 (1982); *Rose v. Bartle,* 871 F.2d 331, 346 (3rd Cir.1989). The three factors used by a court to determine as to whether or not a government official should be given absolute immunity for a particular function: (1) whether there is "a historical or common law basis for the immunity in question"; (2) whether performance of the function poses a risk of harassment or vexatious litigation against the official; and (3) whether

there exists alternatives to damage suits against the officials as means of redressing wrongful conduct. *See Kulwicki v. Dawson,* 969 F.2d 1454 (3rd Cir.1992) (quoting *Mitchell,* 472 U.S. at 521–22, 105 S.Ct. at 2812–13).

A prosecutor's decision to start criminal proceedings is at the core of a prosecutor's role. *Kulwicki,* at 1463 (citing *Imbler,* 424 U.S. at 430–31, 96 S.Ct. at 995–96; *Rose,* 871 F.2d at 343). Even where a defendant has been falsely charged, the criminal system has many built in safeguards, such as a magistrates decision to construe a probable cause affidavit, a preliminary hearing to bind the charges over for trial, and dismissal of the charges.

In Count II of the complaint, Plaintiff alleges that Defendants Burfete and Lichtenwalner gave Defendants Crossin and other investigators "improper advice" to pursue the criminal prosecution of the Plaintiff. These allegations relate directly to the initiation and pursuit of the prosecution by the Defendants. By following the "functional approach", laid down by the Supreme Court in *Burns v. Reed,* 500 U.S. 478, 485, 111 S.Ct. 1934, 1939, 114 L.Ed.2d 547 we find it is important to keep in mind, the "nature and function performed, not the identity of that actor who performed it." *Buckley v. Fitzsimmons,* — U.S. ——, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993) (quoting *Forrester v. White,* 484 U.S. 219, 229, 108 S.Ct. 538, 545, 98 L.Ed.2d 555 (1988)).

Here, in the present case, the Defendants Burfete and Lichtenwalner assisted Defendants Crossin and others in the pursuit for judicial proceedings, not the investigation of the facts that led to the issuance of the indictment. Plaintiff's allegation relates to Defendants Burfete and Lichtenwalner's "improper advice" for the initiation and pursuit of judicial proceedings—arrest, arraignment, preliminary hearing and trial. We cannot find any merit to the Plaintiff's allegations in paragraphs 52 and 53 of his complaint as they relate to Defendants Burfete and Lichtenwalner.[10] Accordingly both Defendants are entitled to absolute immunity.

*2. Qualified Immunity.*

Where absolute immunity does not apply, qualified immunity protects official action, if Defendants Lichtenwalner and Burfete's behavior was "objectively reasonable" in light of the constitutional rights the Plaintiff claims were harmed. Objective reasonableness is determined by the amount of knowledge available to the Defendant at the time the alleged violation took place. *See Kulwicki v. Dawson,* 969 F.2d 1454 (3rd Cir. 1992) (citing *Brown v. Grabowski,* 922 F.2d 1097, 1111 (3rd Cir.1990)).

*a. Media Contact*

Plaintiff alleges in paragraph 54 of Count II the Defendants directed a press release be prepared and later distributed during a press conference which the Plaintiff claims destroyed "any possibility of Plaintiff obtaining a fair trial in Monroe County since Defendants knew their allegations lacked evidence and were without substance." (Doc. No. 1).

"Communication with the press is not core prosecutorial activity. As this Court has noted on two occasions, '[t]alking to the press is, at best, only an administrative function,' *Schrob* [*v. Catterson*], 948 F.2d [1402] at 1420 [ (3rd Cir.1991) ]; *Helstoski v. Goldstein,* 552 F.2d 564, 566 (3rd Cir.1977), subject solely to qualified immunity." *Kulwicki v. Dawson,* 969 F.2d at 1466.

Plaintiff's claim that he did not get a fair trial in Monroe County is simply not true. The presiding judge in the case, due to the nature and notoriety of the case, on November 18, 1991, moved a jury selected from Adams County, Pennsylvania, to Monroe County, pursuant to an order granting a request for change of venue that was filed by Plaintiff's counsel. The jury was transported to Monroe County to sit and hear the trial which commenced on November 19, 1991 and lasted to December 6, 1991. The Plaintiff was eventually acquitted on all charges. We find the press conference conducted by the Attorney General's Office did not destroy the Plaintiff's chance for a trial. The Defen-

10. Even in his brief in opposition Plaintiff fails to introduce any information that raises a material fact in dispute as to these Defendants.

dants' actions in preparation for, and participation in, the press conference were "objectively reasonable" under the circumstances. Even viewing all Plaintiff's evidence in the light most favorable to him, we cannot see any evidence rising to the level of material issue. If the Plaintiff's right to a fair trial was damaged, the injury was remedied by the trial judge's decision to bring in a jury from Adams County. Accordingly, Plaintiff's claim against Defendants Burfete and Lichtenwalner in paragraph 54 will be dismissed.

*C. Defendant Preate.*

Plaintiff alleges in Count II that Defendant Preate is liable for "improper advice" to the prosecutors and investigators and for issuing a press release on April 17, 1991, upon the Plaintiff's arrest.

Personal involvement in the alleged liability is required under 42 U.S.C. § 1983. *See e.g., Gay v. Petsock,* 917 F.2d 768, 771 (3rd Cir.1990); *Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3rd Cir.1988). Liability cannot be predicated solely on the operation of respondeat superior. *Rode,* 845 F.2d at 1207. However, personal involvement of a supervisor can be demonstrated through allegations of personal direction or of actual knowledge or acquiescence in the alleged wrongs. *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1478 (3rd Cir.1990) (citing *Rode,* 845 F.2d at 1207).

The record shows the Attorney General was aware that his office was investigating a decrease of revenue from the parking meters in the Borough of Stroudsburg and that Plaintiff Pansy was kept under surveillance during the course of the investigation and finally Defendant Preate received only updates from his personnel on the status of the investigation. The Attorney General's authority to supervise investigations across the state does not allow the Plaintiff to ultimately charge him with liability. If this were so, he would be liable every time one of his subordinates provided him with an update regarding an investigation.

"Not every injury in which a government official has played some role can be vindicated in a civil rights action." *Young v. Keohane,* 809 F.Supp. 1185, 1200 (M.D.Pa.1992) (citing *Martinez v. California,* 444 U.S. 277, 285, 100 S.Ct. 553, 559, 62 L.Ed.2d 481 (1980)). Thus, even if this Court assumes Plaintiff's rights were violated when the prosecution was brought in Attorney General Preate's name or when the press release was released with Attorney Preate's name and the Attorney General had sent a letter to officials in the Borough of Stroudsburg, Plaintiff may not recover against Defendant Preate because the deprivation was merely an indifferent or incidental result of Preate's conduct. *See Cospito v. Heckler,* 742 F.2d 72, 82 (3rd Cir.1984).

With the issue of causation aside, there is nothing in the record that shows Defendant Preate acted improperly. Furthermore, Defendant Preate is entitled to the same immunities as Defendants Burfete and Lichtenwalner. Even if Defendant Preate provided "improper advice" to the prosecutors, the applicable law, as we earlier explained, still affords him absolute immunity to the Plaintiff's claims [11]. Therefore, under the circumstances, Defendant Preate is entitled to summary judgment as a matter of law.

*D. Witness Immunity.*

Plaintiff alleges in Count I, paragraph 49(d) that Defendant Crossin assisted by Defendants Farkus and Purcell testified incorrectly before the Grand Jury. Defendants contend that Defendant Crossin or anyone else who testified before a grand jury has absolute immunity from prosecution. After reviewing the evidence in the record and the case law applicable we agree.

In *Briscoe v. LaHue,* 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983), the United States Supreme Court granted absolute immunity to two police officers who testified falsely at trial pertaining to a 42 U.S.C. § 1983 action. The Supreme Court determined that § 1983 did not provide a remedy

11. We also dismiss Plaintiff's claims against Defendant Preate in paragraph 54 relating to the press conference. We dismiss them for the same reasons as we did for Defendants Burfete and Lichtenwalner, namely qualified immunity and no actual prejudice.

for damages against a private party for testimony given during a judicial proceeding.[12] The Third Circuit extended this protection to pre-trial proceedings in *Williams v. Hepting,* 844 F.2d 138, 140–41 (3rd Cir.1988). The Third Circuit has reaffirmed the *Williams* decision in *McArdle v. Tronetti, supra* and *Kulwicki v. Dawson,* 969 F.2d 1454 (3rd Cir. 1992).

The record shows that the Plaintiff's claims are based on the Defendants' testimony before the Grand Jury and other judicial proceedings. Because the Defendants' collective testimony given in these proceedings cannot subject them to liability, they are absolutely immune from prosecution. Accordingly, these claims will be dismissed.

*E. Defendant Gallagher.*

In Count IV, Plaintiff alleges claims of failure to train and breach of supervisory liability against Defendants Gallagher and Purcell.[13]

Plaintiff alleges Defendant Gallagher assigned Defendant Crossin to the Plaintiff's investigation knowing that Defendant Crossin had "insufficient training and expertise to handle a largely circumstantial case of alleged white collar theft." (Doc. No. 1, para. 66). Furthermore, Plaintiff alleges Defendants Gallagher and Purcell had knowledge of the alleged constitutional violation of the Plaintiff's rights and participated in it. (Doc. No. 1, para. 67).

However, in 1983 actions, "[l]iability cannot be vicariously or under [the] traditional ground of *respondeat superior.*" *Hampton v. Holmesburg Prison Officials,* 546 F.2d 1077, 1082 (3rd Cir.1976); *Ressler v. Scheipe,* 505 F.Supp. 155, 156 (E.D.Pa.1981). "Direct personal involvement by the Defendants in the conduct depriving a Plaintiff of his rights or active knowledge and acquiescence on the Defendants' part must be alleged. *Bracey v. Grenoble,* 494 F.2d 566 (3rd Cir.1974); *Brown v. Sielaff,* 474 F.2d 826 (3rd Cir. 1973)." *Gilmore v. Jeffes,* 675 F.Supp. 219 (M.D.Pa.1987).

As to Defendant Gallagher, Plaintiff has failed to introduce any evidence that shows where or how Defendant Gallagher had knowledge of insufficient training of Defendant Crossin. Furthermore, the record is also void of evidence of personal involvement by Defendant Gallagher in this case. Because Plaintiff has failed to allege any direct personal knowledge or involvement on the part of Defendant Gallagher, Plaintiff fails to meet the requirements of § 1983 and for that reason the Court will dismiss the claims in Count IV against Gallagher as well.

*F. Punitive Damages.*

Since this Court has determined that Defendants had probable cause to make the arrest and, since there is no evidence of ill will on part of the Defendants in filing criminal charges against the Plaintiff, we find there is no reason to determine the issue of punitive damages in this case.

*CONCLUSION*

Based on the foregoing reasons, this Court will grant the Defendants' Motion for Summary Judgment pertaining to all claims made by Plaintiff.

An appropriate Order is attached.

*ORDER*

AND NOW, THIS 6th DAY OF OCTOBER, 1994, IT IS HEREBY ORDERED THAT:

1. The Defendants' Motion for Summary Judgment is GRANTED.

2. The Plaintiff's claims against Defendants Crossin, Farkus, Gallagher and Purcell are DISMISSED.

12. "A police officer on the witness stand performs the same functions as any witness; he is subject to compulsory process, takes an oath, responds to questions on direct examination and cross-examination, and may be prosecuted subsequently for perjury." *Id.* at 342, 103 S.Ct. at 1119.

13. Because we will dismiss the claims of malicious prosecution, abuse of process and false arrest against Defendant Purcell, we find this claim is without merit and dismiss it as such.

3. The Plaintiff's claims against Defendants Preate, Burfete and Lichtenwalner are DISMISSED.

4. Judgment is entered in favor of the Defendants.

5. The Clerk of Court is directed to close the case file.

6. This Court certifies any appeal from this Order will be deemed frivolous, taken in bad faith and without probable cause.